[Cr. A. No. 696.   Appellate Department, Superior Court, Los Angeles County.—September 26, 1931.]

THE PEOPLE, Respondent, v. A. J. HECHT, Appellant.

(1 Cal. Supp. 193.)

Reames, Lake & Mulvihill for Appellant.

John K. Hull, City Prosecutor, and Martin De Vries, Chief Deputy City Prosecutor for Respondent.

McLUCAS, P. J.—The defendant was convicted of the crime of contriving, preparing, setting up and proposing a lottery, and appeals from the judgment. According to the undisputed facts, the defendant was the owner of the Wilshire Clothes Shoppe, in Long Beach, and sent out

salesmen soliciting memberships in suit clubs, who stated to the persons solicited that they were forming a suit club and wanted sixty members, each member to pay two dollars per week, that as a member was selected for a suit, he received his suit and that ended his payments. Members having the widest acquaintance were first selected in order to boost the sale of memberships. Upon selection of persons having such wide acquaintance, inquiry was made by the solicitor whether the person solicited for membership would help boost the club if he were selected to receive a suit within four or five weeks. The names of the members were to be selected by the solicitor and not by chance. Each week the members were to be notified as to the name of the person selected to receive a suit for that week.

The solicitor delivered to each customer a small contract book in which the date of the first payment and the amount were entered. There was space for 30 payments. The contract was later verified by a different solicitor. Subsequent payments were entered as made. The contract reads as follows:

"Customer's Purchase Contract

"The Wilshire Clothes Shoppe hereby agrees to sell and the holder of this contract agrees to buy, one tailored-to-measure suit or coat for the sum of Sixty ($60.00) Dollars, upon the payment of Two ($2.00) Dollars or more, each week, to its authorized collector, or at its place of business.

"In the event the purchaser shall discontinue payments, this contract shall become null and void, but the Company agrees that it will at any time during the life of this contract, make and deliver to purchaser one of its tailored garments upon payment to the Company of the difference between the amount paid by the said purchaser and Sixty ($60.00) Dollars.

"Verbal agreements between agents and purchasers of this contract contrary to the printed terms contained herein will not be recognized by the Company.

"Payment on another contract cannot be added to amount paid on this contract.

"If you prefer to have your suit or overcoat, before the expiration of this contract, you can obtain same from us at any time by paying up the unpaid balance of this contract.

"The making of the second payment and receipt of this contract shall constitute full acceptance of its terms.

"(Signed)

"THE WILSHIRE CLOTHES SHOPPE."

The contract was not required to be signed by the purchaser.

On the first page of the contract book appeared the following advertisement:

"Each week we will give one or more of our high-grade tailored garments, valued at $60.00, to the person or persons whom we consider can be of greatest assistance to us in securing new customers, and such person will be free from making any payments therefor.

"The tailored garments which are given free to persons in payment for services rendered in obtaining or assisting us in obtaining new customers are awarded strictly upon a basis of merit and no prize, chance or lottery methods of any kind will directly or indirectly be used."

Witnesses for the People testified as follows concerning their dealings with the solicitor:

Ralph Dewey:

"A. He came in and wanted me to go in this suit club and explained it to me.

"Q. What did he say?

"A. He said that if I would go into it they would be glad to use me as a booster, seeing I was in business in town, they thought I could be of some benefit in getting their club started."

The witness joined the suit club, paid two dollars, and received a contract book with an entry of payment of two dollars. Later another payment of two dollars was made to a different salesman, who verified the contract. The witness had not received his suit and his total payments were four dollars. On cross-examination the witness testified:

"Q. Mr. Boch Binder came in and says, 'We have a method here, a club by which we sell suits on time'?

"A. Yes.

"Q. You paid him two dollars and two dollars every week until you paid sixty dollars?

"A. No, sir, he did not say anything about sixty dollars. He said it was a suit club. You paid two dollars down.

. . . . . . . . . . . .

"Q. Then he said if you would be a booster and get other people to buy clothes, why you would get a suit, they would give you a suit?

"A. Yes.

"Q. In return for your boosting?

"A. Yes."

On redirect examination the witness testified:

"Q. Mr. Dewey, how much were you to pay, do you know, into this suit club?

"A. Well, there was no stipulated amount mentioned at all.

"Q. Do you know how much you were to pay?

"A. I was to pay until within a few weeks, they said, using me as a booster and they would push me ahead and fix me a suit a little sooner."

W. H. Taylor testified:

"Q. Who were present at the time he called besides yourself and Mr. Boch Binder?

"A. Just the two of us.

"Q. What was the conversation? Just tell the court any conversation, what you said and what he said.

"A. He asked me if I would join this 'Suit Club', two dollars a week, and pay in until they selected me a good suit. I paid in two weeks and they selected me to get a suit.

"Q. You paid in two weeks. Did you get your suit?

"A. I got measured.

"Q. And you were not to pay any more money?

"A. No, sir, no more.

"Q. At the time you had the conversation, was there anything said as to how much you were to pay?

"A. No.

"Q. Was there anything said at that conversation?

"A. Nothing else said.

. . . . . . . . . . . .

"The Court: When you had this conversation about being selected to have this suit, how did they say you were selected?

"A They said that I would be a good fellow to boost their business.

"Q. They said they just picked you out?

"A. They didn't promise me anything. They just picked me out. I was not promised anything.

"The Court: What are you going to get for your two dollars?

"A. A suit now as I understand it.

"The Court: You are getting your suit for four dollars?

"A. For four dollars, yes, sir."

On cross-examination the witness testified:

"Q. They told you if you would help boost the sale of these suits they would give you a suit for nothing?

"A. They would select me early.

"Q. In other words, you had to go out and pep up their business to help them out, interest your friends?

"A. It was not put that way.

"Q. Was that the general idea?

"A. That was the way I took it."

The witness testified that he received a contract book, the first and last parts of which were read to him. A few days later another solicitor came and verified the contract, after the witness had explained his understanding of the contract. On cross-examination the witness testified that nothing was said about helping out the business to get the suit until the second solicitor came and told him that he had selected him to receive a suit. The witness further testified:

"The Court: Do I understand you to testify he said you were going to get a suit and it would be an extra good suit?

"A. Yes, I took it over to Billy Wright's—

"The Court: And all the fellows coming in would see you wearing that good suit and would ask you where you got the suit and you told them?

"A. Yes, I would say these fellows.

"The Court: Who were those fellows?

"A. The Wilshire Clothes Shop."

Clarence Jensen testified:

"Q. What was said?

"A. Why, he asked me if I would be interested in joining a suit club that he was forming here in Long Beach. He was a business man here and had his place of business in the Pacific Southwest Bank Bldg., and he told me he was

forming a suit club, and he wanted sixty members and each member to pay two dollars a week, and as each one was selected for the suit, each received their suit and that ended their payments from then on.

"Q. Was anything else said?

"A. I asked him one thing in particular, if all the names were put in a box or hat and name drawn out and that one was selected or a name was selected by himself; and he said it was selected by himself.

"Q. Did he tell you how he made the selections?

"A. Yes; he said he selected it from the fellow having the largest acquaintance in town that could help·him boost the club. The ‘man asked me if I would help boost the club if I got a suit in four or five weeks and I told him sure, which any man would and I told him I would join his club and paid him two dollars and got the book and he went out."

The witness paid four dollars and ceased making payments. He further testified:

"Q. Do you know who came after that?

"A. No I don't know; but the second man who came around the first time said he was to verify that I would get the suit in four or five weeks. They didn't set any certain date but it would be four or five weeks and he was going to verify it was all O. K. and he is the same man that came back the third time, or I should say came for the third payment. That was the second time he was there.

"Q. Did you have any other conversation beside what you have told with Mr. Boch Binder?

"A. Yes, there was one thing Mr. Boch Binder said; that each week as the person's name was selected or he selected to give the suit to, all that joined the club would be notified when the man came around to collect the money for that week. He would tell who the man was and the phone number and everything so we could verify it."

The contract book was delivered to the witness, but was not read to or by him. It was stipulated that defendant Hecht was the owner and Boch Binder the salesman for the Wilshire Clothes Shoppe.

The contract on its face is a straight agreement for the purchase and sale of a tailor-made suit for the sum of

sixty dollars, payable two dollars per week, the contract to become null and void upon the discontinuance of payments, but the seller agreed during the life of the contract to deliver a tailored garment upon payment of the difference between the amount paid and sixty dollars. However, it appears from the advertisement in the contract book and from the statements of the solicitors that the plan of doing business was to select some person to receive a suit of clothes and waive all further payments. This was done to boost the business and induce other persons to enter into the contract. It is evident there was a studied scheme to evade the provisions of the lottery law by inserting in the contract book that the tailored garments were given free in payment for services rendered in obtaining new customers, and were awarded strictly upon a basis of merit and that "no prize, chance, or lottery methods of any kind will directly or indirectly be used".

█ Lottery is defined in section 319 of the Penal Code, which reads: "A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known."

It thus appears that the elements of a lottery are (1) the disposition of property, (2) upon a contingency determined by chance, (3) to a person who has paid a valuable consideration for the chance of winning the prize, that is to say, one who has hazarded something of value upon the chance. █ In order to decide whether the scheme adopted in this case was a lottery, it must be determined whether the foregoing elements are present. It must be remembered that the contract itself was only a part of the scheme and that the transaction as a whole must be examined in order to determine whether the scheme is a lottery. Here we have present all the elements of a lottery, unless it can be said there was no chance. There has been a disposition of property and there has been a payment of a valuable consideration, but without chance there can be no lottery.

"So-called clubs wherein the members pay periodical dues and conduct periodical drawings for a specified article of merchandise are lotteries, even though the unsuccessful members are entitled to receive the article eventually, after the payment of a stipulated amount, or to withdraw and take out in trade the installments which they have paid, and although the winners are not determined by lot but are selected by the seller." (38 C. J., p. 299, and cases cited.)

In *People* v. *Wassmus*, 214 Mich. 42 [182 N. W. 66], the defendant sold tailor-made suits for forty-eight dollars, payable one dollar a week under a simple contract similar to the contract in the instant case. According to advertising matter accompanying the contract, each week a suit was discounted or given to one of the customers selected by the management in order to induce the customer selected to use his influence in securing new accounts and allow the use of his name as having received one of the garments. The court said: "It is said that the essentials of a lottery are: *First,* consideration; *second,* prize; *third,* chance. (17 R. C. L., p. 1222.) There need be no question under this scheme about the element of consideration or prize, but it is contended that there is no element of chance in the transaction, that one buys a suit for $48 and gets it, and beside he may get his suit discounted before he makes 48 payments. Herein lies the element of chance. By purchasing a suit for $48 one gets the chance of acquiring it before he pays for it, or before he pays the $48. This chance is the seductive thing about the scheme and it is this which attracts the investor. But it may be said that there is no element of chance because there is no drawing, that the *management itself selects the beneficiary;* but this fact does not purge the transaction of all element of chance. To the purchaser it is uncertain, as to him it is chance."

In *State* v. *Lipkin*, 169 N. C. 265 [Ann. Cas. 1917D, 137, L. R. A. 1915F, 1018, 84 S. E. 340], a scheme by which articles were contracted for at a uniform price to be paid in installments with the possibility of receiving the article before the installments were all paid, and having the contract canceled for advertising purposes, and of losing all right to this privilege by default in payments, was held to be a lottery.. The contract required the customer to make

weekly payments of twenty-five cents until the sum of $17.50 was paid or until his name was selected by the company as an advertising medium. The contract stated, "No method of any kind dependent upon or connected with chance in any form whatever enters into the contract." The court said:

"The same contention was made there (*State* v. *Clark*, 33 N. H. 329 [66 Am. Dec. 723]) as in this case, that the choice of persons to receive the furniture was not by lot or chance, but by the judgment of the company which proposed to sell; but the court rejected it, and thus showed its fallacy: 'With the purchaser, what prize he might obtain was a mere matter of lot and chance. The scheme involved substantially the same sort of gambling upon chances as in any other kind of lottery. It appealed to the same disposition for engaging in hazards and chances with the hope that luck and good fortune may give a great return for a small outlay, and as we think within the general meaning of the word "lottery", and clearly within the mischief against which the statute is aimed.' (*Randle* v. *State*, 42 Tex. 580.)

. . . . . . . . . . . . .

"So far as we can see from the evidence, the managers of the Mutual Supply Company exercised no more than an arbitrary choice of its customers as recipients of its gifts; but, however that may be in fact, the vice of the whole scheme lies farther back than that, and is found in the 'chance' which the customer takes when he pays his money under the terms of the contract, and the temptation held out to arouse the gambling spirit, which is just as evil and debasing as if there were any other kind of chance taken, and, besides, if he fails once or twice, or more times, to win the prize, and discontinues paying, he loses all that he has paid. So that if tempted by this cunning device, which so insidiously appeals to this gambling instinct, his money is risked in the hope of drawing a piece of furniture of much larger value, the person so investing it may lose or win, and in either event may retire, forfeiting what he had paid in the one case, and retaining what he has drawn in the other as the profit of his venture."

So in the present case by purchasing a suit for $60, under the conditions of the contract, the purchaser gets the

chance of securing the suit before he pays for it. As to the purchaser it is uncertain, it is chance that luck and good fortune will give a large return for a small outlay. We therefore conclude that all the essential elements of a lottery are present in the instant case. The judgment is ordered affirmed.

Yankwich, J., *pro tem.*, concurred.