## STATE v. CHARLES G. LIPKIN.

(Filed 24 February, 1915.)

**1. Statutes—Constitutional Law—Police Regulations—Lotteries.**

A "lottery" or game of chance is one injuriously affecting the morals of the people, and laws and regulations necessary for the protection of the health, morals, and safety of society are strictly within the legitimate exercise of the police power of the State, and being of a remedial nature, they will be so construed as to suppress the mischief and advance the remedy, and to defeat all evasions for the continuance of the mischief.

**2. Same—Definition of Lottery.**

The word "lottery" is not a term of the common law with a recognized and established legal definition, and the courts in construing a remedial statute affecting lotteries, or schemes for disposing of real and personal property by chance, will give a meaning to the term according to its use in a popular sense, and with reference to the mischief it is intended to redress. Hence, a lottery may be defined, for all practical purposes, any scheme for the distribution of prizes, by lot or chance, by which one on paying money or giving any other thing of value to another obtains a token which entitles him to receive a larger or smaller value, or nothing, as some formula of chance may determine.

**3. Same—Advertising Scheme.**

A concern selling furniture at a certain fixed price, giving the purchaser a choice of a variety of articles therefor, upon payment of a small weekly sum until the amount is paid, with the agreement that the concern may, at its own discretion, and as an advertisement, at any time, give the furniture to the purchaser without his making further payment, and by no fixed rule, and providing that should he fail to continue his payments he shall forfeit all payments theretofore made by him, is engaging in running a lottery, by whatever name called, or by whatever artifice concealed, in violation of our statute, Revisal, sec. 3726.

**4. Statutes—Lottery—Federal Constitution—Property Rights—Equal Protection.**

The enactment of a law for the suppression of lotteries lies within the police power of a State, and its enforcement does not wrongfully deprive a citizen of his private rights or of the equal protection of the law under the Constitution of the United States, Article XIV, sec. 1.

STATE *v.* LIPKIN.

**5. Statutes—Constitutional Law—Power of Courts.**

> The question as to whether the Legislature has exceeded its constitutional power by arbitrarily interfering with private business or imposing unusual and unnecessary restrictions upon lawful occupations is for the determination of the courts.

APPEAL by defendant from *Ferguson, J.,* at September Term, 1914, of EDGECOMBE.

The prisoner was indicted in the court below for conducting a lottery in violation of Revisal, sec. 3726, which provides that it shall be unlawful to open, set up, promote, or carry on a lottery, publicly or privately, by any name or style, or by such ways and means expose to sale any real or personal property therein described, or goods or chattels, or anything of value whatsoever, and imposing a fine or imprisonment as the punishment for the offense as a misdemeanor. It also provides that any person who engages in disposing of any species of property whatsoever, money or evidences of debt, or in any manner distributes gifts or prizes upon tickets or certificates sold for that purpose shall be subject to prosecution under that section. The following is a copy of the contract referred to in the testimony of Mrs. Emma Jacobs, who first got a wardrobe under a similar contract, and afterwards contracted for a sewing machine by this instrument:

MUTUAL SUPPLY COMPANY,

INCORPORATED.

*Authorized Capital, $25,000.*

FURNITURE, RUGS, JEWELRY, ETC.

COMPLETE HOUSE FURNISHERS. DIRECT FROM FACTORY TO HOME, $17.50 FURNITURE SOCIETY.

CORNER NINTH AND BROAD STREETS, RICHMOND, VA.

ENTRANCE 214 N. NINTH STREET.

WHEN CALLING ON US, BRING THIS CONTRACT WITH YOU.

MUTUAL SUPPLY COMPANY, INC.    CONTRACT No. 4473.

We hereby agree to sell to the holder of this contract, Mrs. Emma Jacobs, and said party agrees to purchase a sewing machine or any one of the articles enumerated on the next page for the sum of $17.50, on the following terms and conditions: Each customer agrees to pay 25 cents per week until the sum of $17.50 has been paid, or until their name is selected by the company as an advertising medium. In order to advertise our business on a broader principle, we will distribute among our patrons each week several pieces of furniture. Patrons who are selected to receive the furniture will not be required to make any further payments, and will then be entitled to receive their furniture at once, providing their payments have been made regularly.

No method of any kind dependent upon or connected with chance in any form whatsoever enters into this contract. We do not authorize agents to make statements or arrangements, verbal or otherwise, to add, change, or erase the terms of this contract.

No money can be lost by lapsing, as the amount paid in can be applied at any time to the purchase of any $17.50 article. The furniture which is distributed each week is given solely for advertising purposes, and the Mutual Supply Company, Inc., reserves the right to make the selection in such a manner as it considers best for the benefit of the business. The consideration of 25 cents paid on receipt of this contract shall constitute a full acceptance of the terms and conditions mentioned herein.

Each contract will entitle the holder to a separate article unless by special agreement in office. No money refunded if discontinued.

Partly filled contract bought or loaned from others cannot be used for redemption of articles enumerated herein.

I have read this contract before signing same and am acquainted with its contents, and as evidence that I understand and fully agree to the printed terms of this contract, I make my first payment.

Address: Tarboro, N. C.             (Signature)   EMMA JACOBS.

Attached to the contract was a card, so arranged with blank spaces as to enter therein the payments made in each week to the number of seventy, which would be $17.50 by addition of the weekly payments. There is also shown on the back of this paper a list of articles of furniture (value $17.50 each) to be selected from by the ticket holders, and a copy of the contract or substantial portions thereof, for the company, with a similar card for entering payments on the back. On each contract are these entries at the bottom: "When calling on us, bring this contract with you. Pay to agent only first payment. Our authorized collector will call weekly," and the title of the concern, as follows: "Mutual Supply Company, Incorporated. Authorized capital, $25,000. Furniture, Rugs, Jewelry, etc. Complete house furnishers. Direct from Factory to Home. The $17.50 Furniture Society, Corner Ninth and Broad Streets, Richmond, Va. Entrance 214 N. Ninth Street. No other but the stipulated terms in this contract will be recognized."

Mrs. Emma Jacobs, a witness for the State, testified: "I live in Tarboro. Mr. Lipkin, the defendant, came to see me last March. Said he was from Richmond. That he wanted to get up a club to establish his furniture. I signed contract for wardrobe. (Admitted to be identical with 4473, taken also by this witness.) Defendant collected 25 cents each week, and I was to get wardrobe. I was going away, and paid $2.25 in advance, and he said this would be all right. He, defendant, never said anything; just said he didn't know when my name would be called

out. I did not get away, and I received card saying my wardrobe was here. I think wardrobe was worth $25. I paid $3.75 in installments. I took out other contracts to get sewing machine and sideboard. I paid installments to Mr. Lipkin. I can't say how many came to see my sideboard, so many did. I was in my room. Mr. Lipkin came in and asked me if I did not want to join the club, and told me how it worked; that he did not know when my name would be called, and I would pay 25 cents a week until it was called, and when I thought I was going away I paid in advance. He said I would have to pay until my name was called out. It might be a long time or a short time. I expected to have to fill my card clean out, that is, pay $17.50. I received notice from Richmond that my name had been called out, and then received wardrobe and paid in $3.75. Mr. Lipkin came to my house every Monday to collect. I don't remember any conversation except he would just come and say for me to pay. I was perfectly satisfied with furniture I got. A good many people came there to see my furniture. I understood if I got others to join, I would get piece of furniture. They told me if I got piece, others would join. Others came and saw my piece and said they were going to join. I stopped paying after Mr. Lipkin was indicted, because I thought I was going away. I was perfectly satisfied and have heard no one complain."

Oscar Lloyd, witness for the State, testified: "I am a barber, single man, and live in Tarboro. I signed that contract of Mutual Supply Company, No. 4492, for the purchase of a brass bed at $17.50. (It is admitted this contract is identical with No. 4473 of Emma Jacobs.) Mr. Lipkin did not get me to sign, but he came round to collect. Mr. Lipkin, when I asked him, said I would have to pay until I got something. If I got out, I would lose what I had paid in. I paid in 75 cents, three installments. I have never gotten anything. I stopped paying because I thought I was not going to get anything. No one told me to stop. I expected to get something if I stayed in. I stopped because I got tired paying in and not getting anything."

R. B. Hyatt, witness for the State, testified: "I am sheriff of Edgecombe and I know the defendant. He told me that he was representing a furniture house in Richmond. I told him a drawing like that was a violation of law. He said he was going to try it, and that it was an advertising scheme. He went on for some time before I arrested him. He said some of the members were to be drawn out each week. He was arrested 11 June. At the trial before the recorder, when he was convicted, it was understood there would be no new contracts, but collections would be made on the contracts existing and everybody was to act in good faith pending the appeal in this case. I can't be positive he said selection or drawing. Selection might have been his word; I don't recall.

STATE v. LIPKIN.

I know one was to come off every week, but I don't recall if it was a drawing or selection."

The State rested its case.

The defendant moved to dismiss the action or for judgment of nonsuit, under chapter 73, Laws 1913. Motion denied. Defendant excepted.

Mr. Abrams, only witness of defendant, testified: "I live in Richmond, Va. I am office manager of the Mutual Supply Company. I have been with them one year. I am familiar with their manner of doing business. Many thousands of dollars worth of stock is kept on hand. When an agent sells a contract, it is executed in duplicate. One copy is left with purchaser and the original is filed. I have charge of them. In selections of furniture to be given members, there is no drawing of any kind. The selection is made in the following way: Many pieces of furniture are given away. For instance, if Mrs. Jacobs benefits the company, she receives her piece of furniture. We receive information from our agents if customers are benefiting business. The agent soliciting the trade keeps a record, which is filed with company, showing what benefit customer is to business, and when furniture is given we expect her to recommend her friends. Emma Jacobs gave us several names and her friends bought furniture. That is the advertising feature spoken of in contract, and she was selected for reason of advertisement. The article furnished Emma Jacobs was worth $17.50. Mr. Lipkin, the defendant, is our local collector. He got those contracts. I did not say Emma Jacobs got a $25 wardrobe for $3.75. I said it was worth $17.50. Mrs. Gray Andrews, of this place, was of great benefit to company. I have no stock in Mutual Supply Company. The principal office is at 214 N. Ninth Street, Richmond, Va. Our chief warehouse is at 30 N. Seventh Street. It is a three-story building. We have all kinds of furniture direct from factory to home. We do not store much furniture. We have a great deal on hand. Mrs. Andrews paid 25 cents. She was of much benefit. Somebody got a brass bed. We may give away our furniture if we wish. We have many thousands of members. We have not been run out of Rocky Mount, but are doing business there today. We number the contracts because we have many alike, and every contract is numbered and filed according to number. The numbers have nothing to do with selections. At present we give away things to advertise. I do not know of any concern like ours in Richmond. The numbers are put on contracts for the purpose of bookkeeping. Our agent is collecting in Rocky Mount this week. The only trouble we have had is in Wilmington, and it was agreed here we were to take no new contracts pending this appeal. Complaint was made by a dissatisfied customer in District of Columbia, and the district attorney investigated and refused to prosecute."

The State and defendant closed the case. Defendant renewed his motion to nonsuit or dismiss under chapter 73, Laws 1913. Motion refused. Defendant excepted. In apt time the defendant requested the court to give the following instructions to the jury:

1. If the jury find the evidence offered by the State to be true, then they will return a verdict of "Not guilty."

2. If the jury find the undisputed evidence offered in this case to be true, then they will return a verdict of "Not guilty."

3. The jury are instructed that if they find the evidence offered by the State to be true, they will return a verdict of "Not guilty," for that if section 3726 of the Revisal of 1905, under which this prosecution is had, undertakes to prohibit the carrying on of the business of the Mutual Supply Company, Incorporated, for which defendant is salesman or agent, as is shown here by the evidence and contract, it would be void as contravening the Constitution of the United States, for the following reasons: (1) Because said section to that extent would be in violation of first section of Article XIV of the said Constitution of the United States, because it would deprive the defendant of his liberty and property without due process of law; and (2) because it would deprive the defendant under the first section, Article XIV of the Constitution of the United States of the equal protection of the laws, in this: that the furniture allotted to certain customers for advertising purposes under the terms of the contract offered in evidence does not come within the prohibition of said section 3726 of Revisal 1905.

The court refused to give any of these instructions, and defendant excepted. The court instructed the jury, if they believed the evidence, to return a verdict of "Guilty." Defendant excepted. Verdict of guilty and judgment thereon. Defendant appealed.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Melville Flegenheimer and J. M. Norfleet for defendant.*

WALKER, J., after stating the case: It is well settled that laws and regulations necessary for the protection of the health, morals, and safety of society are strictly within the legitimate exercise of the police power, and in the interpretation of such remedial statutes the office of the judges, it has been said, is to make such a construction as will suppress the mischief and advance the remedy, and to defeat all evasions for the continuance of the mischief. *Magdalen College case,* 11 Co., 71 b. The word "lottery" is not a term of the common law, and to dispose of real or personal property by lot is not an offense which has a recognized and established legal definition, and, therefore, in construing the statute we must be guided chiefly by the meaning of the term as it is ordinarily

used in a popular sense, and by reference to the mischief intended to be redressed. *S. v. Clarke,* 33 N. H., 329. A lottery, for all practical purposes, may be defined as any scheme for the distribution of prizes, by lot or chance, by which one, on paying money or giving any other thing of value to another, obtains a token which entitles him to receive a larger or smaller value, or nothing, as some formula of chance may determine. This definition has generally been approved by the authorities. *S. v. Perry,* 154 N. C., 616, and cases cited; *Long v. State,* 74 Md., 565. In the case last cited, as showing the strong trend of judicial thought in this country against lottery enterprises, the Court said that it will appear, from the many cases decided upon the subject, to be difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been adjudged as in violation of the lottery or gambling laws of the various States, which are mostly alike. And we say that no sooner is a lottery defined, and the definition applied to a given state of facts, than ingenuity is at work to evolve some scheme of evasion which is within the mischief, but not quite within the letter of the definition. But, in this way, it is not possible to escape the law's condemnation, for it will strip the transaction of all its thin and false apparel and consider it in its very nakedness. It will look to the substance and not to the form of it, in order to disclose its real elements and the pernicious tendencies which the law is seeking to prevent. The Court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited, or if it has the element of chance. It is the one playing at the game who is influenced by the hope enticingly held out, which is often false or disappointing, that he will, perhaps and by good luck, get something for nothing, or a great deal for a very little outlay. This is the lure that draws the credulous and unsuspecting into the deceptive scheme, and it is what the law denounces as wrong and demoralizing.

In *Thomas v. People,* 59 Ill., 160, it was urged, in defense of a similar scheme, that no plan of distribution had been decided upon; that the purchasers were to receive certain articles in a just and legal manner, and that a plan might be devised, at the proper time, which would neither violate the law nor be in contravention of good morals. The Court replied that if the prizes were distributed "in a just and legal manner" it should be done in an honest, upright, and equitable one, and there should be perfect fairness and equality. The plan would be utterly violated if any one of the numerous purchasers should fail to receive a prize. The distribution could not be in a "just and legal manner" unless the number of purchasers was the same as the number of prizes, and the prize received proportional, as nearly as possible, to the amount of

money paid. It is barely possible, but most improbable, that the purchasers would be the same in number as the presents. We could not indulge in so unreasonable a presumption, even in a criminal proceeding. In ordinary affairs we must reason upon probabilities, deduce conclusions from facts, and not indulge in mere conjectures. We have no right to harbor wild imaginings to change a reasonable and probable result. The Court then says: "Had not this plan been watched by the vigilance of the law, can there be any doubt that numerous persons would have purchased tickets, prompted by the hope of gain? Are there not inseparably connected with it the same fascination and excitement and intense desire for gain which gather around the gaming table? Like any other species of gambling, lotteries have a pernicious influence upon the character of all engaged in them. This influence may be as direct and the immediate consequences as disastrous as in some kinds of gambling which rouse the violent passions and stake the gambler's whole fortune upon the throw of a die. The temptations, however, are thrown in the way of a larger number and a better class. The evil may spread more widely and infect more deeply. It is said that the plan was undetermined, and that the wisdom of the 'advisory committee would have devised one, just and equal.' So chance is always undetermined. It neither forms nor designs. Intention is never attributed to it; its events are uncertain. The promise of the handbill, that the distribution shall be in a just and legal manner, is evasive. We are not bound to determine the intention from the language alone, but from all the facts, and the reasonable deductions from facts."

That case is a fair comment and a just criticism upon the facts of this one, showing the clear illegality of the transaction. It is not pretended here that the projector of this enterprise, either in the matter of volition, as to the giving of presents, or of approbation, as to the recipients of them, founds its action on any settled rule of conduct, or judges by any standard of comparison or selection which would appear reasonable to itself or to others. *S. v. Shorts,* 32 N. J. L., 398; *Com. v. Wright,* 137 Mass, 250. So far as appears, the choice among those who are to receive its favors is based upon nothing more than its arbitrary will, exercised for its own benefit, in advancing its scheme by advertising, it may be admitted, but this does not alter the case, as all such concerns are organized and set up for just this purpose. Nor does it matter that the person who buys a chance for a trivial sum, in the expectation of winning something of much larger value, can go on with his contributions, and, after paying the full amount of $17.50, get the piece of furniture he may want. This has been held not to divest it of its gambling quality. *S. v. Perry, supra; Deflorin v. State,* 121 Ga., 593; *S. v. Moren,* 48 Minn., 555. In the case last cited it is said that such a feature would

STATE *v.* LIPKIN.

probably operate as an additional incentive to purchase a chance in the lottery scheme, and does not take it out of the statute, as the vicious element still inheres in it. The sale of the ticket gave the purchaser the chance to obtain something more than he paid for it, and the other fact became an extra inducement for the purchase, making the general scheme more attractive and alluring. The difference between it and a single wager on the cast of a die is only one of degree. They are both intended to attract the player to the game, and have practically the effect of inducing others, by this easy and cheap method of acquiring property of value, to speculate on chances in the hope that their winnings may far exceed their investment in value. This is what the law aims to prevent in the interest of fair play and correct dealing, and in order to protect the unwary against the insidious wiles of the fakir or the deceitful practices of the nimble trickster. Call the business what you may, a "gift sale," "advertising scheme," or what not, but it is none the less a lottery, and we cannot permit the promoter to evade the penalties of the law by so transparent a device as a mere change in style from those which have been judicially condemned, if the gambling element is there, however deep it may be covered with fair words or deceitful promises. If it differs from ordinary lotteries, it is chiefly in the fact that it is more artfully contrived to impose upon the ignorant and credulous, and is, therefore, more thoroughly dishonest and injurious to society. So far as those who manage schemes of this character can be supposed to give the credulous persons who deal with them any chance whatever of a return in greater value for their investment, the chance lies in the purchase of the right to participate in the favor offered or held out to tempt the gambling instinct and thereby to prosper the business of the unlawful concern. *Dunn v. The People*, 40 Ill., 465. All pay them money, at least in part, for the *chance* of winning a prize of greater or less value in proportion to what they hazard, however it may be glossed with some apparent safeguard against loss. Many will take the chance of the play, not expecting to continue the payments if they should lose at the first, second, or third attempt, or at some later period. According to every correct idea of legal definition or conception, this must be gaming within the meaning of the law, whether we construe it in letter or in spirit. All new artifices designed to evade and cheat the law, and entrap the unwary or ignorant, are but aggravations of the offense, and the more ingenious and deep-laid they are, the greater the wrong. *Bell v. State*, 37 Tenn. (5 Speed), 507.

In the *Deflorin case, supra,* referring to the contention of the defendant that the purchaser of a ticket could continue to pay and get the goods, the Court said: "The fact that a member who was unlucky in the drawing of prizes might, by continuing to pay a dollar a week for thirty

18—169

weeks, receive a suit of clothes, regardless of the result of the drawings, does not make the transaction any the less a lottery; for the lucky members of the club won prizes varying in value from $1 to $29." And the Court quoted from *Shumate's case,* 15 Grattan (Va.), 653, the following passage as a full answer to the position: "It is true that a bet does imply risk, but it does not necessarily imply a risk in *both* parties. There must be between them a chance of gain and a chance of loss, but it does not follow that each of the parties to the bet must have both these chances. If, from the terms of the engagement, one of the parties may gain, but cannot lose, and the other may lose, but cannot gain, and there must be either a gain by the one or a loss by the other, according to the happening of the contingency, it is as much a bet or wager as if the parties had shared equally the chances of gain and of loss." See, also, an elaborate and exhaustive discussion of the question by *Justice Cobb,* in *Myer v. State,* 112 Ga., 20.

The ingredient of chance is, obviously, the evil principle which the law denounces and will eradicate, however it may be clothed, or however it may conceal itself in a fair exterior. It is by this means that cupidity is solicited or an appeal is made to avarice, for if fortune be propitious, or chance should favor him, either in his selection as the winner of its favor or in the mere turn of a wheel, or the throw of the dice, or the fall of the coin, a return of value is expected for the small consideration or trivial price paid for the privilege of being thus favored. *S. v. Shorts,* 32 N. J. L., 398.

The case of *S. v. Clarke,* 33 N. H., 329, appears to be very much in point. The Court said of a similar enterprise: "The jury were well warranted in finding that according to some scheme upon which the defendants professed to act there was a correspondence between the numbers placed on the books purchased and the different articles proposed as gifts or prizes, by which when the book was purchased the defendants ascertained what gift or prize the purchaser was entitled to have according to their scheme. The defendants, on the evidence, appear to have held out that notion to the public, and the jury were at liberty to find that, so far at least, the business was fairly conducted. The purchaser did not know when he bought his book and paid his money what prize or gift the number on it would entitle him to receive, and it was with him as much a matter of lot and chance as if he had drawn the number from a hat. He paid more than the book was worth, and the excess must be understood to have been paid for this chance. As to the real nature of the contrivance, it stands as if the excess had been paid for the chance without any sale of a book to color the transaction."

The same contention was made there as in this case, that the choice of persons to receive the furniture was not by lot or chance, but by the

judgment of the company which proposed to sell but the Court rejected it, and thus showed its fallacy: "With the purchaser, what prize he might obtain was a mere matter of lot and chance. The scheme involved substantially the same sort of gambling upon chances as in any other kind of lottery. It appealed to the same disposition for engaging in hazards and chances with the hope that luck and good fortune may give a great return for a small outlay, and, as we think, within the general meaning of the word 'lottery,' and clearly within the mischief against which the statute is aimed." *Randle v. State,* 42 Texas, 580.

Defendant's counsel, in their able and learned argument, have cited us to *People v. Elliott,* 3 L. R. Anno. (O. S.), 403; but upon examining the case we find this stated: "It is not the drawing of the lots, but the disposing and selling of the chances, that brings the case within the statute. It is promoting the lottery for money by paying the money for the chances of receiving more. It is of little consequence where the drawing takes place. These views to some extent will be found supported in the following authorities: (citing many cases). It is thought by counsel for defendant that this case is ruled by *People v. Reilly,* 50 Mich., 384. That case, however, is different. There the contingency was one upon which the parties interested could exercise their reason and judgment under an agreement upon which the money was paid, and was in its nature executory. In this case the money was paid when the chance was obtained, and there was no opportunity for exercising the reason or judgment or any other faculty of the mind; and hence the lottery."

We think this substantially supports our view of the question. So far as we can see from the evidence, the managers of the "Mutual Supply Company" exercised no more than an arbitrary choice of its customers as recipients of its graft; but however that may be in fact, the vice of the whole scheme lies farther back than that, and is found in the "chance" which the customer takes when he pays his money, under the terms of the contract, and the temptation held out to arouse the gambling spirit, which is just as evil and debasing as if there were any other kind of chance taken; and, besides, if he fails once or twice or more times to win the prize, and discontinues paying, he loses all that he has paid. So that if tempted by this cunning device, which so insidiously appeals to this gambling instinct, his money is risked in the hope of drawing a piece of furniture of much larger value, the person so investing it may lose or win, and in either event may retire, forfeiting what he had paid in the one case, and retaining what he has drawn in the other as the profit of his venture.

The only difference between this case and that of *S. v. Perry,* 154 N. C., 616, is that there the suit of clothing was drawn by lot; but there

is the same element of chance here, even if in a less degree, as there is no rule or standard for the investor to determine what his luck will be, nor can the managers of the scheme forecast at the time of hazard what the result will be. Mrs. Jacobs, as the evidence shows, performed no services, if any at all, until after she had received the wardrobe, which she exhibited and extolled to her friends, who doubtless considered it a good return for so small an outlay in money, and concluded to take the same risk, hoping to be favored with the same kind of good fortune. The temptation was increased by holding out that they might not lose if they continued in the game to the end. *S. v. Perry, supra,* where we held, citing 25 Cyc., 1639: "Suit clubs, the members of which pay weekly dues and have weekly drawings for suits, the unsuccessful members being entitled to receive a suit eventually, after the payment of a stipulated amount, or to withdraw and take out in trade the installments which they have paid, are lottery schemes." We further said in that case: "It will be seen by examination of the authorities that chance is an essential element of a lottery, whether that chance be as to any return or merely as to the amount or value of the return; and as thus considered, where there is a hazard in which sums are ventured upon the chance of obtaining a greater value, the scheme partakes of the nature of a lottery—that is, something gained or won by lot. 5 Words and Phrases, pp. 4245 and 4246, where many cases are collected. The definition of the term 'lottery' given above has been approved by this Court. *S. v. Lumsden,* 89 N. C., 572."

In the view we take of the case, it comes within that principle, and the courts will not be deceived or misled by attractive names or professions of honest intentions. As said by the Court in *S. v. Morris,* 77 N. C., at p. 516, referring to the language of *Justice Grier* in *Phalen v. Virginia,* 8 How. (U. S.), 168: "The 'North Carolina Beneficial Association' is an imposing title, but the law has pronounced it in its lottery features to be a cheat and a nuisance to be suppressed like other public pestilences. Of all the forms of gambling, it is the most widespread and disastrous, entering almost every dwelling, reaching every class, preying upon the hard earnings of the poor, and plundering the ignorant and simple."

Having decided this question against defendant, it follows that, if we are right, there is nothing in the case involving the violation of defendant's rights under the fourteenth amendment to the Federal Constitution. The State has the right to enforce all needful police laws and regulations for the preservation of the health, morals, and safety of the people, and especially for the suppression of lotteries. *Boyd v. Alabama,* 94 U. S., 645; *Stone v. Mississippi,* 101 U. S., 814; *Douglass v. Kentucky,* 168 U. S. The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or im-

pose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination of its police powers is not final or conclusive, but is subject to the supervision of the courts. This must needs be so, and it was so definitely held in *Lawston v. Steele*, 152 U. S., 133; but no violation of private right is presented in this case.

We are also inclined to the opinion that the Legislature intended by the last words of section 3726, being the amendment made by Laws 1874-5, ch. 96, to enlarge the scope of the previous enactment so as to include enterprises of this kind; but it is unnecessary to decide this question, as it is sufficient to hold that the scheme is a lottery within the intent and meaning of the statute.

No error.