**HEST TECHNOLOGIES, INC. v. STATE of N.C. ex rel. PERDUE**

[366 N.C. 289 (2012)]

HEST TECHNOLOGIES, INC. and INTERNATIONAL INTERNET TECHNOLOGIES,
LLC v. STATE OF NORTH CAROLINA ex rel. BEVERLY PERDUE, GOVERNOR, in
her official capacity; NORTH CAROLINA DEPARTMENT OF CRIME CONTROL AND
PUBLIC SAFETY; SECRETARY OF CRIME CONTROL AND PUBLIC SAFETY
REUBEN YOUNG, in his official capacity; ALCOHOL LAW ENFORCEMENT
DIVISION; DIRECTOR OF ALCOHOL LAW ENFORCEMENT DIVISION
JOHN LEDFORD, in his official capacity

No. 169A11-2

(Filed 14 December 2012)

**1. Constitutional Law— First Amendment—electronic sweep-
stakes machines—regulation of conduct not speech**

N.C.G.S. § 14-306.4, which bans the operation of electronic
machines that conduct sweepstakes through the use of an "enter-
taining display," regulates conduct, with only incidental burdens
on associated speech, and is therefore constitutional. The Court
of Appeals' decision to declare the statute an overbroad restric-
tion on protected speech and to strike it down as unconstitu-
tional was reversed.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a
divided panel of the Court of Appeals, —— N.C. App. ——, 725 S.E.2d
10 (2012), affirming in part and reversing in part an order and final
judgment entered on 30 November 2010 by Judge John O. Craig, III in
Superior Court, Guilford County. Heard in the Supreme Court on 17
October 2012.

*Kilpatrick Townsend & Stockton LLP, by Adam H. Charnes,
Richard S. Gottlieb, and Richard D. Dietz, and Grace, Tisdale
& Clifton, P.A., by Michael A. Grace and Christopher R. Clifton,
for International Internet Technologies, LLC; and Smith Moore
Leatherwood LLP, by Richard A. Coughlin and Elizabeth B.
Scherer, for Hest Technologies, Inc., plaintiff-appellees.*

*Roy Cooper, Attorney General, by John F. Maddrey, Solicitor
General, and Hal F. Askins, Special Deputy Attorney General,
for defendant-appellants.*

HUDSON, Justice.

[N]o sooner is a lottery defined, and the definition applied to a
given state of facts, than ingenuity is at work to evolve some
scheme of evasion which is within the mischief, but not quite

within the letter of the definition. But, in this way, it is not possible to escape the law's condemnation, for it will strip the transaction of all its thin and false apparel and consider it in its very nakedness. It will look to the substance and not to the form of it, in order to disclose its real elements and the pernicious tendencies which the law is seeking to prevent. The Court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited . . . . It is the one playing at the game who is influenced by the hope enticingly held out, which is often false or disappointing, that he will, perhaps and by good luck, get something for nothing, or a great deal for a very little outlay. This is the lure that draws the credulous and unsuspecting into the deceptive scheme, and it is what the law denounces as wrong and demoralizing.

*State v. Lipkin*, 169 N.C. 323, 329, 169 N.C. 265, 271, 84 S.E. 340, 343 (1915).

In an effort to curtail the use of a perceived loophole in the State's gambling laws, the General Assembly passed N.C.G.S. § 14-306.4, which bans the operation of electronic machines that conduct sweepstakes through the use of an "entertaining display." *See* N.C.G.S. § 14-306.4(b) (2011). Claiming an unconstitutional restriction on their freedom of speech, plaintiffs challenged the new law. The Court of Appeals declared the statute an overbroad restriction on protected speech and struck it down as unconstitutional. We conclude that this legislation regulates conduct and not protected speech and now reverse.

Since the founding of this nation, states have exercised the police power to regulate gambling. *See, e.g., Calcutt v. McGeachy*, 213 N.C. 1, 7, 195 S.E. 49, 52 (1938) (stating that "the Legislature under the police power vested in it has considered it necessary in suppressing and prohibiting gambling to enact laws from time to time to meet changing machines and devices tending to and fostering gambling"). State legislatures have weighed the social costs of gambling against the economic benefits and chosen different paths according to each legislature's conclusions. North Carolina's approach has evolved from a total ban on casino gaming and lotteries to authorization of a State-run education lottery and limited casino activity on Native American lands within the state. *See* Act of July 8, 2010, ch. 103, pmbl., 2009 N.C. Sess. Laws (Reg. Sess. 2010) 408, 408.

As new technology has developed, the General Assembly has faced the advent of "video poker" and other forms of gambling involving

**HEST TECHNOLOGIES, INC. v. STATE of N.C. EX REL. PERDUE**

[366 N.C. 289 (2012)]

computers and the Internet. In 2006 the General Assembly banned video poker and all other forms of electronic gambling. Since that time companies have developed systems that appear to sidestep traditional gambling restrictions by combining legal sweepstakes with video games that simulate a gambling environment, thus purportedly removing the "bet" or consideration element of gambling.[1] Faced with the proliferation of these systems in North Carolina, and having concluded that these systems—while not fitting the traditional definition of gambling—give rise to the same concerns as traditional gambling, the General Assembly enacted N.C.G.S. § 14-306.3 in 2008 and N.C.G.S. § 14-306.4 in 2010 in an effort to ban them.

Originally, plaintiffs' systems used simulations of poker or traditional slot machine games to reveal the sweepstakes result; however, law enforcement officers around the state began to take action against establishments using plaintiffs' systems, treating the devices as illegal slot machines. On 4 March 2008, plaintiffs sought a declaration that their systems are legal and an injunction prohibiting defendants from taking adverse action against retailers selling their products, which had included seizing equipment, closing down shops, and initiating criminal prosecutions. That same day the trial court heard the matter and issued a temporary restraining order. The trial court held a second hearing on 14 March, and granted a preliminary injunction on 16 April 2008. On 18 July 2008, the General Assembly enacted Senate Bill 180, which made it unlawful to possess a game terminal that simulates slot machine games or games like video poker. Plaintiffs modified their systems to substitute gaming displays that did not involve simulations of traditional gambling games like slot machines or video poker. They sought a modification of the preliminary injunction to reflect these adjustments on 31 October 2008 and received such a modification on 5 December 2008.

On 8 July 2010, the General Assembly enacted House Bill 80, captioned "An Act to Ban the Use of Electronic Machines and Devices for Sweepstakes Purposes," which is now codified as N.C.G.S. § 14-306.4. Ch. 103, 2009 N.C. Sess. Laws (Reg. Sess. 2010), 408. The Preamble to

---

1. Gambling is traditionally understood to contain three elements: chance, consideration, and prize or reward. *See, e.g., Ward v. W. Oil Co.*, 387 S.C. 268, 278, 692 S.E.2d 516, 522 (2010) (quoting and citing *State v. 158 Gaming Devices*, 304 Md. 404, 425, 499 A.2d 940, 951 (1985) (identifying "[t]he three elements of gambling—consideration, chance and reward")). The North Carolina statute defining gambling, while using different words, is quite similar in its effect. *See* N.C.G.S. § 14-292 (2011) (including in definition of gambling any "game of chance . . . at which any money, property or other thing of value is bet").

the Session Law includes a statement of purpose underlying the new law. After briefly reviewing the history of gambling laws in the state and recent efforts to ban video poker and similar games, the General Assembly noted that "companies have developed electronic machines and devices to gamble through pretextual sweepstakes relationships with Internet service, telephone cards, and office supplies, among other products," and that "such electronic sweepstakes systems utilizing video poker machines and other similar simulated game play create the same encouragement of vice and dissipation as other forms of gambling . . . by encouraging repeated play, even when allegedly used as a marketing technique." *Id.*, pmbl., at 408.

In relevant part, Chapter 103 of the 2010 Session Laws makes it unlawful to "operate, or place into operation, an electronic machine or device" to "[c]onduct a sweepstakes through the use of an entertaining display." *Id.*, Sec. 1, at 409-10. An "electronic machine or device" is defined as "a mechanically, electrically or electronically operated machine or device . . . that is intended to be used by a sweepstakes entrant, that uses energy, and that is capable of displaying information on a screen or other mechanism." *Id.*, at 408. An "entertaining display" is defined as "visual information, capable of being seen by a sweepstakes entrant, that takes the form of actual game play, or simulated game play." *Id.*, at 409. The statute contains a nonexclusive list of examples of such displays, including, among others, "video poker" and "video bingo," as well as a catch-all provision covering "[a]ny other video game not dependent on skill or dexterity that is played while revealing a prize as the result of an entry into a sweepstakes." *Id.*

Plaintiffs are companies that, according to their motion for a preliminary injunction, "market and sell prepaid products, primarily long-distance telephone and/or high-speed internet service." As a promotion, plaintiffs have developed electronic sweepstakes systems. Sweepstakes participants obtain entries from a predetermined, finite pool of entries—some of which are associated with a prize value and some of which are not—either after a qualifying purchase of plaintiffs' products or at no charge upon request.[2] Participants receive a magnetic stripe card which allows them to access a gamestation terminal and stores the information related to their individual sweepstakes entries. At the terminal "the program reveals the content of

---

1. Free entries are limited to one entry per day if requested in person and one entry per mailed-in request if sought by mail; the number of mail-in requests for entries is unrestricted.

the sweepstakes entry using different displays that simulate various game themes." These simulated games do not determine, and cannot modify, the sweepstakes outcome or any prize that might be associated with a sweepstakes entry. Any prize amount won through the sweepstakes may be claimed in cash at the counter of the establishment or may be used at the game terminal to purchase more of the product in one-dollar increments, thereby enabling the customer to immediately receive more sweepstakes entries.

On 1 October 2010, after the General Assembly enacted the current version of N.C.G.S. § 14-306.4, plaintiffs filed an amended complaint challenging the constitutionality of the statute under the First Amendment to the United States Constitution and Article I, Section 14 of the North Carolina Constitution. On 30 November 2010, the trial court concluded that the law is constitutional in all aspects except for the catch-all provision found in N.C.G.S. § 14-306.4(a)(3)(i), which it declared overbroad. Based upon that conclusion, the court dissolved the preliminary injunction and allowed law enforcement activity to proceed in accordance with its order. Both parties appealed.

The Court of Appeals majority concluded that both the announcement of the sweepstakes result and the video games are protected speech and that the definition of "entertaining display" in the statute is virtually unlimited. *Hest Techs., Inc. v. State ex rel. Perdue,* —— N.C. App. ——, ——, 725 S.E.2d 10, 12-14 (2012). Based upon these conclusions, the court held the entire statute unconstitutionally overbroad. *Id.* at ——, 725 S.E.2d at 14-15. The State appealed, and we now reverse.

This case has arisen in the context of repeated efforts by the General Assembly to combat the perceived "vice and dissipation" of gambling, as noted in the preamble to the legislation. The statute banning this type of sweepstakes and video game combination is the culmination of a protracted effort by the General Assembly to eradicate electronic gambling. In 2006 the legislature banned video poker and similar video gambling games. In response, businesses reformatted their machines to include sweepstakes rather than direct betting, but used the same video gambling interfaces to simulate the gambling experience. In 2008 the General Assembly banned the use of simulated slot machines and simulated video gambling in "server-based electronic game promotion[s]," which were defined to encompass these sweepstakes. *See* Act of July 18, 2008, ch. 122, sec. 1, 2007 N.C. Sess. Laws (Reg. Sess. 2008) 464, 464. In response, sweepstakes businesses altered their video game displays to avoid traditional gambling

HEST TECHNOLOGIES, INC. v. STATE of N.C. ex rel. PERDUE

[366 N.C. 289 (2012)]

themes like poker. The General Assembly responded with House Bill 80, a more general ban on electronic sweepstakes promotions. In many ways, this entire saga—and ultimately our decision here—were foretold with uncanny accuracy by this Court nearly one hundred years ago in *State v. Lipkin*, quoted at the outset of this opinion. A similar theme arose in 1923 when the General Assembly first specifically banned slot machines. *See Calcutt*, 213 N.C. at 6, 195 S.E. at 52.

While one can question whether these systems meet the traditional definition of gambling—because plaintiffs have ostensibly separated the consideration or "bet" element from the game of chance feature by offering "free" sweepstakes entries—it is clear that the General Assembly considered these sweepstakes systems to be the functional equivalent of gambling, thus presenting the same social evils as those it identified in traditional forms of gambling. *See* Ch. 103, pmbl., 2009 N.C. Sess. Laws (Reg. Sess. 2010) at 408 ("[E]lectronic sweepstakes systems utilizing video poker machines and other similar simulated game play create the same encouragement of vice and dissipation *as other forms of gambling* . . . by encouraging repeated play, even when allegedly used as a marketing technique[.]" (emphasis added)). In effect, the General Assembly determined that plaintiffs' business models, involving sales of Internet time and telephone cards with accompanying "free" sweepstakes entries, are a mere pretext for the conduct of a de facto gambling scheme. The Preamble to the Session Law contains legislative findings to this effect, and "[a]lthough the legislative findings and declaration of policy have no magical quality to make valid that which is invalid, and are subject to judicial review, they are entitled to weight in construing the statute." *Redev. Comm'n of Greensboro v. Sec. Nat'l Bank of Greensboro*, 252 N.C. 595, 611, 114 S.E.2d 688, 700 (1960).

Elsewhere in the country, other courts facing challenges to the enforcement of similar laws have upheld them precisely because the Internet sweepstakes systems have been viewed as gambling in disguise. In *United States v. Davis* the Fifth Circuit Court of Appeals concluded that "the main purpose and function of [the] Internet cafés was to induce people to play the sweepstakes, and that the Internet time sold by the cafés—albeit at fair market value—was not the primary subject of the transaction, but instead mere subterfuge." 690 F.3d 330, 339-40 (5th Cir. 2012). The court then upheld the defendants' convictions for illegal gambling. *Id.* at 342. Similarly, in *Telesweeps of Butler Valley, Inc. v. Kelly*, the court concluded that "Plaintiff's attempt to separate the consideration from the chance to

HEST TECHNOLOGIES, INC. v. STATE of N.C. ex rel. PERDUE

[366 N.C. 289 (2012)]

win by inserting a step between the two elements is clever, but it merely elevates form over substance. At bottom, what Telesweeps is doing constitutes gambling." No. 3:12-CV-1374, 2012 WL 4839010, at *9 (M.D. Pa. Oct. 10, 2012).

It would be convenient for this Court to similarly declare that plaintiffs' systems constitute gambling because "gambling[ ]implicates no constitutionally protected right; rather, it falls into a category of 'vice' activity that could be, and frequently has been, banned altogether." *United States v. Edge Broad. Co.*, 509 U.S. 418, 426, 113 S. Ct. 2696, 2703 (1993).[3] Notably, the federal courts in both *Davis* and *Telesweeps*, as well as state courts that have addressed Internet sweepstakes businesses, had evidentiary records before them showing that the Internet time and telephone calling cards allegedly constituting the cafés' primary products were not actually used by the customers and therefore, represented pretextual transactions that merely enabled the gambling scheme. *See Davis*, 690 F.3d at 335 (citing testimony that less than $100 of the $27,770 of Internet time sold at one establishment during a representative week was actually used); *Telesweeps*, 2012 WL 4839010, at *4 (stating that Telesweeps, which claimed its "primary business" was selling telephone calling cards, kept no record "of how many cards or minutes ha[d] been sold or used"); *see also State v. Vento*, 2012-NMCA-99, ¶¶ 5, 23, —— N.M. ——, ——, ——, 286 P.3d 627, 630, 635 (Ct. App. 2012) (citing evidence that 99.75% of Internet time purchased went unused). While common sense indicates that similar patterns are present in Internet sweepstakes cafés throughout the country, the factual record here does not show whether the telephone or Internet time that sweepstakes participants purchase is ever used. Thus, legislative findings and common sense notwithstanding, we cannot on this record summarily conclude that these plaintiffs are involved in an illegal gambling operation that uses the sale of legal products as a pretext to avoid state gambling laws.

In the end, though, the label the General Assembly has placed on this activity is not dispositive. What matters is that the General Assembly has identified a threat to the public and acted to address it.

---

3. Plaintiffs argue that the General Assembly is not free to attach a "vice" label to any particular activity and therefore render it unprotected by the First Amendment. While in general this assertion may be true, plaintiffs' argument fails here. If plaintiffs were correct that the government cannot regulate any vices that involve speech, then North Carolina's ban on video poker would also be unconstitutional. Video poker involves a video game and a results announcement just as much as plaintiffs' systems do here, but no one questions whether the State can constitutionally ban video poker.

"It is well settled that the police power of the state may be exerted to preserve and protect the public morals. It may regulate or prohibit any practice or business the tendency of which, as shown by experience, is to weaken or corrupt the morals of those who follow it or to encourage idleness instead of habits of industry." *State v. Felton*, 239 N.C. 575, 581, 80 S.E.2d 625, 630 (1954). Here the General Assembly exercised its police power to address the problem it saw; as long as the General Assembly has not contravened a constitutional prohibition in the process, the law is valid. *State v. Arnold*, 147 N.C. App. 670, 673, 557 S.E.2d 119, 121 (2001) (citations omitted), *aff'd per curiam*, 356 N.C. 291, 569 S.E.2d 648 (2002). After careful constitutional analysis, we conclude that N.C.G.S. § 14-306.4 as enacted in 2010 does not violate the First Amendment because it regulates conduct, not protected speech.

The central issue we face here is whether to characterize what N.C.G.S. § 14-306.4 actually regulates as conduct or protected speech. Plaintiffs argue that the law prohibits the video games involved in their sweepstakes systems, and that these video games are entertainment and thus merit full First Amendment protection. Plaintiffs in the companion case, *Sandhill Amusements, Inc. v. State of North Carolina*, assert that the law is primarily a restriction on the announcement of the sweepstakes result, which they contend is protected speech. The State maintains that the law only prohibits specific conduct, namely, placing into operation an electronic machine that conducts sweepstakes using an entertaining display.

We are convinced that N.C.G.S. § 14-306.4 primarily regulates noncommunicative conduct rather than protected speech. This conclusion turns directly on how we describe what N.C.G.S. § 14-306.4 does. The statute here makes it "unlawful for any person to operate, or place into operation, an electronic machine or device" to "[c]onduct a sweepstakes through the use of an entertaining display." N.C.G.S. § 14-306.4(b). Operating or placing into operation an electronic machine is clearly conduct, not speech. We conclude that the act of running a sweepstakes is conduct rather than speech, despite the fact that sweepstakes participants must be informed whether they have won or lost. " '[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.' " *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S. Ct. 1912, 1918 (1978) (citation omitted).

Plaintiffs maintain that the video games, or "entertaining display," involved in the sweepstakes systems represent speech protected by the First Amendment. The flaw in this argument is that the statute does not prohibit the video games, only the conduct of a sweepstakes that happens to announce its result through such video games. As the federal district court in the Middle District of Florida decided in a nearly identical case, plaintiffs "are free to provide the video games to their patrons and their patrons are free to play them—and thus make and receive whatever protected message is communicated by the video game—so long as the games are not associated with the conduct of a payoff." *Allied Veterans of the World, Inc. v. Seminole Cnty.*, 783 F. Supp. 2d 1197, 1202 (M.D. Fla. 2011), *aff'd per curiam*, 468 F. App'x 922 (11th Cir. 2012). We find that reasoning compelling here.[4] Unfortunately, our determination that the primary target of this regulation is conduct rather than speech does not neatly end the inquiry. Because regulations that legitimately restrict conduct may still unduly burden speech rights, we must carefully evaluate the plaintiffs' assertions that the speech at issue here implicates the First Amendment.

The First Amendment to the United States Constitution reads in part that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The North Carolina Constitution states: "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained . . . ." N.C. Const. art. I, § 14. Read without context, these provisions appear to be crystal clear, bright-line rules. History, necessity, and judicial precedent have proven otherwise: "Freedom of speech is not an unlimited, unqualified right." *State v. Leigh*, 278 N.C. 243, 250, 179 S.E.2d 708, 712 (1971) (citation omitted).

The first complicating factor here is that not all speech is protected speech. There exist "certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72, 62 S. Ct. 766, 769 (1942). The United States Supreme Court has outlined particular categories of speech that receive no First Amendment protection; these categories include "obscenity, defamation, fraud, incitement, and speech inte-

---

4. We note that plaintiffs do not actually permit their customers to play their video games outside the context of the sweepstakes. Plaintiffs have chosen to make acquisition of sweepstakes entries a prerequisite to playing the video games.

gral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 130 S. Ct. 1577, 1584 (2010) (internal citations omitted).

The second complicating factor is that not all protected speech actually involves words. The United States Supreme Court has "acknowledged that conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.' " *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2539 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 2730 (1974) (per curiam)). On the other hand, the Court has also refused to accept the view "that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 1678 (1968). As the Court has noted, "It is possible to find some kernel of expression in almost every activity a person undertakes . . . but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S. Ct. 1591, 1595 (1989).

In short, what at first glance appears to be a bright-line prohibition on laws restricting speech relies, in operation, on careful application of the proper level of scrutiny based on the nature of the speech and the importance of the governmental interest involved. Regulation of so-called pure speech, a term that most often refers to political advocacy, must pass strict scrutiny: the government must show a compelling interest in the regulation, and the regulation must be narrowly tailored to achieve that interest. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, —— U.S. ——, ——, 131 S. Ct. 2806, 2817 (2011) (citations omitted). Regulation of many other types of speech, including rules governing commercial speech, *see Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 183-84, 119 S. Ct. 1923, 1930 (1999), measures directed at conduct that involves both speech and nonspeech elements, *see O'Brien*, 391 U.S. at 376-77, 88 S. Ct. at 1678-79, and regulations that only affect the time, place, or manner of speech, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753 (1989), must pass only intermediate scrutiny. Articulations of intermediate scrutiny vary depending on context, but tend to require an important or substantial government interest, a direct relationship between the regulation and the interest, and regulation no more restrictive than necessary to achieve that interest. *See Greater New Orleans*, 527 U.S. at 183, 119 S. Ct. at 1930. Regulation of conduct that is not " 'sufficiently imbued with elements

**HEST TECHNOLOGIES, INC. v. STATE of N.C. ex rel. PERDUE**

[366 N.C. 289 (2012)]

of communication' " to earn First Amendment protection, *Johnson*, 491 U.S. at 404, 109 S. Ct. at 2539, needs only bear " 'some rational relationship to a legitimate state purpose.' " *Stanglin*, 490 U.S. at 23, 109 S. Ct. at 1594 (citation omitted).

Plaintiffs argue that two recent First Amendment decisions from the United States Supreme Court require that we hold their systems to be protected under the First Amendment: *Brown v. Entm't Merchs. Ass'n*, —— U.S. ——, 131 S. Ct. 2729 (2011); and *Sorrell v. IMS Health, Inc.*, —— U.S. ——, 131 S. Ct. 2653 (2011). The Court in *Sorrell* determined that a law restricting marketers' use of prescriber-identifiable prescription data was an impermissible content- and speaker-based restriction. —— U.S. at ——, 131 S. Ct. at 2672. In *Brown* the Court ruled that a law banning the sale of violent video games to minors was an impermissible content-based restriction on protected speech. —— U.S. at ——, 131 S. Ct. at 2738. Plaintiffs cite *Sorrell* in an effort to attach First Amendment protection to the sweepstakes result itself, and *Brown* in an effort to attach First Amendment protection to the video games used by the sweepstakes system to entertain customers before revealing the sweepstakes result.

We conclude that *Sorrell* does not apply here. First, *Sorrell* did not definitively determine that the prescriber-identifiable prescription data at issue in that case was actually protected speech, allowing only that there is "a strong argument that prescriber-identifying information is speech for First Amendment purposes." —— U.S. at ——, 131 S. Ct. at 2667. Rather, the decision of the Court turned on the fact that the law at issue "imposed content- and speaker-based restrictions on the availability and use of prescriber-identifying information." *Id.* at ——, 131 S. Ct. at 2667. Here there is no speaker-based restriction: anyone can conduct a sweepstakes and offer video games independently, and no one can combine the two. There is also no content-based restriction related to the sweepstakes result because the law applies regardless of the content of the announcement—the announcement could say "winner" or "you lose" or "good job" or "too bad" or simply show the amount of money won, and the law would still apply. More importantly, we are not convinced that the announcement is protected speech at all because the announcement is merely a necessary but incidental part of the overall noncommunicative activity of conducting the sweepstakes. That the conduct at issue relies upon words to announce the result does not automatically implicate the First Amendment. *See Ohralik*, 436 U.S. at 456, 98 S. Ct. at 1918.

We find the analysis of the Court of Appeals for the Seventh Circuit in *There to Care, Inc. v. Comm'r of Ind. Dep't of Revenue*, 19 F.3d 1165 (7th Cir. 1994), to be particularly apt here:

> Is bingo speech? People buy cards in the hope of winning back more than they spend. A voice at the front of the hall drones "B-2" and "G-49"; after a while someone at the back of the hall shouts "BINGO!" and gets a prize. These words do not convey ideas; any other combination of letters and numbers would serve the purpose equally well. They employ vocal cords but are no more "expression" than are such statements as "21" in a game of blackjack or "three peaches!" by someone who has just pulled the handle of a one-armed bandit.

*Id.* at 1167. Telling a sweepstakes participant that he or she has won or lost is no more protected speech than calling "Bingo!" or "21."

Similarly, *Brown* does not apply here. While *Brown* confirmed that First Amendment protection extends to video games, the Court struck down the state law at issue because it was a content-based restriction on violent video games. —— U.S. at ——, 131 S. Ct. at 2738. Here N.C.G.S. § 14-306.4 applies regardless of the content of the video game. In fact, plaintiffs emphasized that the video game is entirely unconnected to the sweepstakes result—this is by necessity because the predetermined nature of the sweepstakes results is a key part of plaintiff's avoidance of traditional gambling laws. Just as the sweepstakes operates irrespective of the video game outcome, the law operates irrespective of the content of the video game; the statute is concerned only with the attachment of an announcement of a sweepstakes result to the game, a juxtaposition that creates the functional equivalent of a gambling environment and thereby encourages the ills the General Assembly sought to remedy.

Plaintiffs argue that even if the statute ostensibly targets conduct, their speech (the result announcement or the video game) is still restricted in violation of the First Amendment. This argument also fails. Even if we were to conclude that section 14-306.4, while directed at conduct, burdens some speech, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell*, —— U.S. at ——, 131 S. Ct. at 2664. In such scenarios courts have traditionally applied the test from *United States v. O'Brien. See, e.g., Hodgkins v. Peterson*, 355 F.3d 1048, 1057 (7th Cir. 2004) (applying *O'Brien* to general conduct regulation that incidentally burdens speech); *Jews for Jesus*,

*Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.,* 968 F.2d 286, 295 (2d Cir. 1992) (same).

Under *O'Brien* a regulation of conduct that incidentally burdens speech

> is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S. Ct. at 1679. Courts have long held that the State's police power includes the power to address the health, safety, and welfare concerns presented by gambling operations, as well as activities that implicate the same concerns, even if they cleverly avoid the traditional definition of gambling. *See, e.g., Felton,* 239 N.C. at 581, 80 S.E.2d at 630 (declaring that the State "may regulate or prohibit any practice or business the tendency of which, as shown by experience, is to weaken or corrupt the morals of those who follow it"). The State's interest in combatting the "encouragement of vice and dissipation" presented by these operations is an important or substantial interest. *See Posadas de Puerto Rico Assocs. v. Tourism Co.,* 478 U.S. 328, 341, 106 S. Ct. 2968, 2977 (1986) (stating that regarding prohibition of casino gambling, the legislature's "interest in the health, safety, and welfare of its citizens constitutes a 'substantial' governmental interest"). The interest in combatting the social ills of gambling and gambling-like activities is unrelated to the suppression of free expression. As noted above, even the specific means of achieving that interest here are unrelated to the suppression of free expression because the statute targets the running of a particular type of sweepstakes operation and does not ban the video games employed except when they are used as a conduit for the sweepstakes. Finally, we conclude that the restriction imposed here is no greater than necessary because the statute burdens only sweepstakes conducted in a manner that encourages repeated, addictive, gambling-like play through the video display; the statute does not burden or ban any video games outside this context of sweepstakes operations.

The statute's compliance with this last prong of the *O'Brien* test effectively forecloses plaintiffs' overbreadth argument, which formed the basis of the Court of Appeals' decision. "[P]articularly where conduct and not merely speech is involved, we believe that the over-

HEST TECHNOLOGIES, INC. v. STATE of N.C. ex rel. PERDUE

[366 N.C. 289 (2012)]

breadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S. Ct. 2908, 2918 (1973). Here the statute's "plainly legitimate sweep," *id.*, includes plaintiffs' devices. We see no speech or conduct, other than that which is plainly the target of the legislation, that would be chilled or otherwise burdened by this statute. Perhaps tellingly, plaintiffs have provided no actual examples, in briefs or oral argument, of conduct or speech that was not intended to be covered by the statute yet still arguably falls within the statute's ambit. Though the language of the statute is admittedly broad, we decline to consider it substantially overbroad without any actual example of conduct or speech that is unintentionally regulated or burdened by the statute. *See Virginia v. Hicks*, 539 U.S. 113, 122, 123 S. Ct. 2191, 2198 (2003) ("The overbreadth claimant bears the burden of demonstrating, from the text of [the law] and *from actual fact*, that substantial overbreadth exists.") (brackets in original) (emphasis added) (citation and internal quotation marks omitted).[5]

Ironically, plaintiffs concede that the State could ban all sweepstakes (despite the fact that such a ban would still burden their alleged speech) but they argue that the State cannot selectively ban particular sweepstakes that implicate specific legislative concerns. This Court has rejected that argument:

[T]here is no constitutional requirement that a regulation, in other respects permissible, must reach every class to which it might be applied—that the Legislature must be held rigidly to the choice of regulating all or none. . . . It is enough that the present statute strikes at the evil where it is felt and reaches the class of cases where it most frequently occurs.

*Adams v. N.C. Dep't of Natural & Econ. Res.*, 295 N.C. 683, 693, 249 S.E.2d 402, 408 (1978) (alterations in original) (quoting *Silver v. Silver*, 280 U.S. 117, 123-24, 50 S. Ct. 57, 59 (1929)); *see also Posadas*, 478 U.S. at 346-47, 106 S. Ct. at 2979-80 ("Legislative regulation of products or activities deemed harmful . . . has varied from outright prohibition . . . to legalization of the product or activity with restrictions . . . . To rule out the latter, intermediate kind of response would require more than we find in the First Amendment.") (footnote and

---

5. The trial judge at the preliminary injunction hearing offered a scenario in which the statute might apply to a hypothetical restaurant sweepstakes involving an entertaining display, but hypothetical overbreadth is not sufficient to strike down an otherwise constitutional law.

internal citations omitted). The General Assembly has chosen, through N.C.G.S. § 14-306.4, to address a specific type of sweepstakes operation that exploits a loophole in the state's gambling laws but presents the same social evils as gambling, while deciding that the majority of sweepstakes operations (which do not pose the same risks) are legitimate marketing tools. This policy decision is within the legislature's purview, and we decline to weigh in on that decision other than to conclude that it is constitutional because there is a rational basis for it.

Plaintiffs have attempted to "skillfully disguise[ ]" conduct with a façade of speech to gain First Amendment protection for their conduct. *Lipkin*, 169 N.C. at 329, 169 N.C. at 271, 84 S.E. at 343. We have "strip[ped] the transaction of all its thin and false apparel and consider[ed] it in its very nakedness," *id.*, and have found plaintiffs' arguments unavailing. We conclude that N.C.G.S. § 14-306.4 regulates conduct, with only incidental burdens on associated speech, and is therefore constitutional.

Therefore, the decision of the Court of Appeals is reversed. This case is remanded to the Court of Appeals for further remand to the Superior Court, Guilford County, for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.