IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1034

Filed: 18 June 2019

Alamance County, No. 16 CVS 990

CRAZIE OVERSTOCK PROMOTIONS, LLC, Plaintiff,

v.

STATE OF NORTH CAROLINA; and MARK J. SENTER, in his official Capacity as Branch Head of the Alcohol Law Enforcement Division, Defendants.

Appeal by Plaintiff from order entered 7 August 2018 by Judge Vince M. Rozier, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 24 April 2019.

> *Morning Star Law Group, by Keith P. Anthony and William J. Brian, Jr., for the Plaintiff.*

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Olga Vysotskaya de Brito, for the State.*

DILLON, Judge.

Plaintiff Crazie Overstock Promotions, LLC ("Crazie Overstock"), appeals from an order granting partial summary judgment to Defendants (the "State") on the basis that Crazie Overstock operates a gambling enterprise in violation of Sections 14-306.1A and 14-306.4 of our General Statutes. After careful review, we affirm in part and reverse in part. Specifically, we conclude that Crazie Overstock operates electronic gaming machines in violation of Section 14-306.4, as a matter of law,

because these machines award "prizes" to winning patrons in a game of chance. However, we conclude that the State was not entitled to summary judgment as to whether the operation of these machines violates Section 14-306.1A, as there is an issue of fact regarding whether patrons are required to pay consideration for the opportunity to play the machines.

## I. Background

In May 2016, Crazie Overstock commenced the underlying action after the State began investigating its retail establishments. In its complaint, Crazie Overstock sought, among other relief, a declaratory judgment that its gaming machines at those establishments were lawful *and* an injunction to prevent the State from interfering with its business.

In July 2018, the State filed a motion for summary judgment. Crazie Overstock voluntarily dismissed its claims against any individual Defendants, leaving only its declaratory judgment and injunctive relief claims pending for trial.

After a hearing on the matter, the trial court granted summary judgment to the State, declaring that Crazie Overstock was violating two of North Carolina's "Lotteries and Gaming" statutes, namely Sections 14-306.1A and 14-306.4. The trial court certified its judgment for immediate appeal. Crazie Overstock timely appealed.

## II. Crazie Overstock's Enterprise

Crazie Overstock's enterprise involves two games played on electronic machines: a game of chance followed by a game of skill. These games are played as follows:

Crazie Overstock sells gift certificates which may be used to purchase items from its website or its retail stores. For every ten dollars ($10.00) spent on gift certificates, a patron also receives one thousand (1,000) Game Points. With these Game Points, the patron is eligible to play two games on electronic machines: (1) a game of chance, called the Reward Game, followed by (2) a game of skill, called the Dexterity Game.

In the first game, patrons use their Game Points to play the Reward Game, a game of chance on an electronic machine simulating a traditional slot machine. Patrons wager Game Points for the chance to win Reward Points. If the patron "wins" on a particular play, he or she is awarded a number of Reward Points, equal to some multiple of the Game Points wagered on that winning play. If the patron loses all of his or her plays, he or she is still awarded one hundred (100) Reward Points.

After playing the Reward Game, the game of chance, the patron takes Reward Points earned and wagers them in the Dexterity Game, a game of skill which tests his or her hand-eye coordination. The Dexterity Game involves a simulated stopwatch which repeatedly and rapidly counts up from 0 to 1000 and back down to 0. A patron "wins" Dexterity Points by stopping the stopwatch between 801 and 1000.

If a patron stops the stopwatch between 951 and 1000, then one hundred percent (100%) of any wagered Reward Points are converted to Dexterity Points; if between 901 and 950, then ninety percent (90%) of any wagered Reward Points are converted to Dexterity Points; and if between 801 and 900, then fifty percent (50%) of any wagered Reward Points are converted. Dexterity Points are redeemable for cash at a rate of one dollar ($1.00) for every one hundred (100) Dexterity Points. If a patron stops the stopwatch between 0 and 800, he or she does not win any Dexterity Points; but all wagered Reward Points are converted back into Game Points which can be used to play the Reward Game for more chances to try and win Reward Points.[1] The patron, though, is allowed three attempts at stopping the stopwatch with each play, with winnings based on the best result. And the evidence in the record suggests that the Dexterity Game is not all that difficult; over ninety-five percent (95%) of patrons playing the Dexterity Game successfully stop the stopwatch above 800 on at least one of their three tries, and therefore win some amount of money.

By way of example, consider a patron who enters a Crazie Overstock retail establishment and spends one hundred dollars ($100.00) to purchase a one hundred dollar ($100.00) gift certificate. The patron may use this gift certificate to purchase

---

[1] Crazie Overstock does offer every patron one hundred (100) Game Points per day with no purchase of a gift certificate required. Patrons may also receive one hundred (100) Game Points by requesting these points by mail.

merchandise at the establishment or from Crazie Overstock's website. In any event, the patron also receives ten thousand (10,000) Game Points.

The patron uses the ten thousand (10,000) Game Points to play the Reward Game, the game of chance, betting some portion on each play, and either losing the Game Points wagered or winning Reward Points equal to some multiple of the Game Points wagered on that spin. After playing all of ten thousand (10,000) Game Points, the patron is left with some number of Reward Points. Even if the patron loses every play, the patron is still awarded a minimum of one hundred (100) Reward Points.

But assume that the patron is lucky in the Reward Game and has turned ten thousand (10,000) Game Points into twenty thousand (20,000) Reward Points. This lucky patron has essentially won the right to win up to two hundred dollars ($200.00) in the Dexterity Game. In the Dexterity Game, the patron bets all twenty thousand (20,000) Reward Points. If the patron's best score in three attempts is above 950, that patron essentially wins two hundred dollars ($200.00). The lucky patron has doubled his money. If the patron's best result is between 901 and 950, he walks away with one hundred eighty dollars ($180.00). If the patron's best result is between 801 and 900, he breaks even, walking away with one hundred dollars ($100.00). If the patron fails in any attempt to stop the stopwatch above 800, he does not win any Dexterity Points, and therefore no cash, but is awarded twenty thousand (20,000) Game Points,

which can be used to again play the Reward Game, the game of chance, with hopes of winning Reward Points and another try at the Dexterity Game.

But even assuming our patron is not lucky in the Reward Game and loses all of his Game Points in that Reward Game of chance, he still receives a minimum of one hundred (100) Reward Points, which can be used to win up to one dollar ($1.00) in cash in the Dexterity Game, thus walking out with ninety-nine dollars ($99.00) less in cash than when he entered.

Therefore, a patron walking into a Crazie Overstock establishment who successfully plays the Reward Game of chance is likely to walk out with some multiple of the money he brought into the store. If he dedicates some amount of money into playing but is not successful in the Reward Game, the patron is likely to walk out with only one dollar ($1.00). In any event, the patron still walks out with gift certificates, redeemable for merchandise on Crazie Overstock's website and at its retail locations. It is unclear how much this merchandise is worth, but evidence in the record suggests that very few gift certificates are actually ever redeemed by patrons.

## III. Analysis

Crazie Overstock argues that the trial court erred in granting summary judgment to the State, declaring that Crazie Overstock's program is illegal under Sections 14-306.1A and 14-306.4 of our General Statutes.

We review an order granting summary judgment *de novo.* *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). A grant of summary judgment is proper when there is no genuine issue of material fact. N.C. Gen. Stat. § 1A-1, Rule 56(c) (2018).

Based on our review of the record, for the following reasons we affirm the grant of summary judgment as to Section 14-306.4; but we agree with Crazie Overstock that it was error for the trial court to grant summary judgment as to Section 14-306.1A and reverse that portion of the order.

Section 14-306.1A prohibits one from placing into operation a video gaming machine which allows a patron to make a wager for the opportunity to win money or another thing of value through a game of chance. N.C. Gen. Stat. § 14-306.1A (2016).

Section 14-306.4 prohibits one from placing into operation an electronic machine which allows a patron, with or without the payment of consideration, the opportunity to win a prize in a game or promotion, the determination of which is based on chance. N.C. Gen. Stat. § 14-306.4 (2016). One key difference between this Section and Section 14-306.1A is that a violation of this Section can occur even if the patron is not required to wager anything for the opportunity to win a prize.

One of the issues on appeal is whether Crazie Overstock operates a "game of skill" rather than a "game of chance," as Sections 14-306.4 and 14-306.1A only proscribe machines where prizes can be won through a game of chance. Our Supreme

Court has been rather consistent on the standard to apply in delineating between a game of chance and a game of skill. For instance, in 1848, in holding that bowling is a game of skill, Chief Justice Ruffin took great pains to describe the difference between a "game of chance" and a "game of skill," as follows:

> The phrase, "game of chance," is not one long known in the law and having therein a settled signification, but was introduced into our statute book by the act of 1835. . . . [This term] must be understood [] as descriptive of a certain kind of games of chance in contra-distinction to a certain other kind, commonly known as games of skill. [We hold that] "a game of chance" is such a game, as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or adroitness have honestly no office at all, or are thwarted by chance.

*State v. Gupton*, 30 N.C. 271, 273-74 (1848). More recently, in a dissent adopted by our Supreme Court, Judge (now Justice) Ervin similarly reasoned that "the essential difference between a game of skill and a game of chance for purposes of our gambling statutes . . . is whether skill or chance determines the final outcome and whether chance can override or thwart the exercise of skill." *Sandhill Amusements, Inc., v. Sheriff of Onslow Cnty.*, 236 N.C. App. 340, 369, 762 S.E.2d 666, 685 (2014) (Ervin, J., dissenting), adopted by our Supreme Court, 368 N.C. 91, 773 S.E.2d 55 (2015).

As recognized by our Supreme Court, there are elements of "chance" in many "games of skill." For instance, in *Gupton*, Chief Justice Ruffin stated that "an unexpected puff of wind" or "unseen gravel" may turn aside a skillfully tossed ring or ball towards its target, but that such element of chance does not convert a ring

toss game or bowling game into a game of chance. *Gupton*, 30 N.C. at 274. Similarly, it has been recognized that there are sometimes elements of skill present in games of chance. *See, e.g., Collins Coin Music Co. of N.C., Inc., v. N.C. Alcoholic Beverage Control Comm'n*, 117 N.C. App. 405, 409, 451, S.E.2d 306, 308 (1994) (holding that video poker is a game of chance as chance "negates [the] limited skill element"). Ultimately, whether a game is one of chance or one of skill is dependent on which element "is the dominating element that determines the result of the game." *State v. Eisen*, 16 N.C. App. 532, 535, 192 S.E.2d 613, 616 (1972) (recognizing that blackjack has some elements of skill and chance).

In the present case, Crazie Overstock argues that its game is one of skill since skill is the dominating element in determining whether a patron wins money: no matter how lucky a patron is in the first part of the game in racking up Reward Points, the patron can only win money by performing well in the Dexterity Game.

We agree with Crazie Overstock that, though it appears little skill is truly required, its Dexterity Game alone is one of skill, which, by itself, does not violate either Section 14-306.4 or 14-306.1A. Though patrons can win money playing the Dexterity Game, the outcome of the game is dependent primarily on the patrons' ability to react in a timely fashion.

We conclude, however, that Crazie Overstock's Reward Game is a separate game in which patrons have the opportunity to win something of value. And there

is no argument that the outcome of the Reward Game is based on chance, as the game involves a simulated slot machine. Further, we conclude that the Reward Game indeed offers a "prize," that is, something of value. *See* N.C. Gen. Stat. § 14-306.4(a)(4) (2016) (defining "prize[,]" in part, as "anything [] of value"). Namely, lucky patrons win *the opportunity* to play an easy game of skill for money; and this opportunity to win money, itself, is a thing of value.

The exact odds and payouts for a winning spin of the virtual reels in the Reward Game is not in the record. But assume that a patron buys a twenty dollar ($20.00) gift certificate and, thus, receives two thousand (2,000) Reward Points. If the patron risks all these points in a single "spin" and the result is a winning combination which pays double, she is awarded *the opportunity* to play an easy game of skill, the Dexterity Game, where she has a high likelihood of walking away with forty dollars ($40.00). But if the patron's "spin" in the Reward Game results in a losing combination, she is awarded only the opportunity to win one dollar ($1.00) in the Dexterity Game. Thus, in the Reward Game of chance, the patron may win the opportunity to win thirty-nine ($39.00) extra dollars, just for being lucky.

If we were to hold that Crazie Overstock's Reward Game and Dexterity Game were together a game of skill, then our gambling statutes as a whole would be rendered largely meaningless, as illustrated in the following example: The operation of a typical roulette wheel, with eighteen (18) red slots, eighteen (18) black slots, and

two green slots, is clearly illegal gambling in North Carolina. For example, an establishment who allows patrons to wager twenty dollars ($20.00) on "red" and then pays those patrons twenty additional dollars ($20.00) if the ball indeed falls into a red slot would be violating our gambling laws. *See* N.C. Gen. Stat. § 14-292 (2016) (proscribing most forms of gambling on games of chance). However, applying the logic of Crazie Overstock's argument, an establishment offering roulette could circumvent our proscription against gambling by simply *not* paying winners an additional twenty dollars ($20.00) in cash but rather award them each *the opportunity* to win an additional twenty dollars ($40.00) in cash by making at least one out of three lay-ups on a three-foot high basketball goal.[2] Such an outcome is, of course, absurd. Therefore, we must reject Crazie Overstock's analysis.[3]

---

[2] The fact that Crazie Overstock allows "losers" of the Reward Game of chance the opportunity to win one dollar ($1.00) in the Dexterity Game does not change our analysis. In our example, an establishment is still operating an illegal game even if it offers losers the opportunity to win twenty-five (25) cents by making a lay-up, as the odds remain with the establishment.

[3] Even analyzing the Reward Game and the Dexterity Game as a *single* game, as advocated by Crazie Overstock, we conclude that the element of chance overrides any element of dexterity. In reaching this conclusion, we follow the reasoning applied in Judge Ervin's dissent in *Sandhills* that was adopted by our Supreme Court. *Sandhill Amusements*, 236 N.C. App. at 369, 762 S.E.2d at 685 (Ervin, J., dissenting). The game at issue in *Sandhills* involved a video machine displaying a virtual, three-reel slot machine. If the spin produced a winning combination, the player won. In that game, the position of the three reels after a spin was determined totally by chance, but the game also had a skill element. The game allowed the player *after the spin* to then "nudge" one of the reels by one position to produce a different, and perhaps winning, combination. Thus, in some plays, the player had the ability to change a losing spin into a winning spin. Notwithstanding, our Supreme Court still concluded that the game as a whole was one of chance, as a matter of law:

> [U]se of the equipment at issue here will result in the playing of certain games in which the player will be unable to win anything of value regardless of the skill or dexterity that he or she displays. Finally, the

Our General Assembly has prohibited certain forms of gambling, including certain video games which offers prizes. Such is within the police power of that body. *Hech Techs., Inc. v. State*, 366 N.C. 289, 290, 749 S.E.2d 429, 431 (2012) (recognizing that "[s]ince the founding of this nation, states have exercised the police power to regulate gambling"). It is not for the Courts to legalize gambling video games but rather is within the province of our General Assembly to make that decision.

## III. Conclusion

We, therefore, conclude that the Reward Game violates Section 14-306.4, as a matter of law, as it offers patrons the opportunity to win a "prize," defined, in part, as "anything [] of value," where the outcome is based on chance. N.C. Gen. Stat. § 14-306.4(a)(4). We further conclude that the operation of the Dexterity Game, by itself, does not violate either Section 14-306.4 or 14-306.1A, as a matter of law.

---

> extent to which the opportunity arises for the "nudging" activity [to produce a winning combination] appears to be purely chance-based. . . . [T]he only basis for th[e] assertion [that the game was one of skill] was the player's ability to affect the outcome by "nudging" a third symbol in one direction or the other after two matching symbols appeared at random on the screen. Assuming for purposes of argument that this "nudging" process does involve skill or dexterity, I am unable to see how this isolated opportunity for such considerations to affect the outcome overrides the impact of the other features which, according to the undisputed evidence, affect and significantly limit the impact of the player's skill and dexterity on the outcome. . . . As a result, for all of these reasons, I am compelled by the undisputed evidence to conclude that the element of chance dominates the element of skill in the operation of Plaintiffs' machines[.]

*Id.* at 369-70, 762 S.E.2d at 686. In the same way, here, chance determines whether a Crazie Overstock patron will have the opportunity to use dexterity to win any money (over one dollar ($1.00)).

However, there is at least an issue of fact as to whether the Rewards Game violates Section 14-306.1A. One does not violate this Section unless the game of chance requires the patron to wager something of value. And it is unclear whether, here, patrons are required to wager anything of value. Patrons who are awarded two thousand (2,000) Game Points for twenty dollars ($20.00) also receive a twenty dollar ($20.00) gift certificate, redeemable for merchandise.

Accordingly, we affirm summary judgment awarded to the State on the claim under Section 14-306.4 of our General Statutes, as Crazie Overstock's business scheme constitutes an illegal sweepstakes. We reverse summary judgment on the claim for a declaration under Section 14-306.1A, as it is not clear whether payment is required to play the Reward Game. On remand, the trial court may consider whether a trial is necessary or whether this second issue is mooted by our determination that the scheme is otherwise illegal under Section 14-306.4.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

Judge MURPHY concurs.

Judge HAMPSON concurs by separate opinion.

HAMPSON, Judge, concurring.

I concur with the majority opinion in this case. I write separately to add that, at least in my view, our reversal of summary judgment on the question of whether Crazie Overstock's business model violates N.C. Gen. Stat. § 14-306.1A should not be construed as an indication that Crazie Overstock's business model does not violate N.C. Gen. Stat. § 14-306.1A. Rather, Crazie Overstock has generated a triable issue of fact as to whether the sale of gift certificates, in fact, constitutes the sale of a legitimate product offered in the free marketplace by a business regularly engaged in the sale of such goods or services or whether the sales of these gift certificates constitutes a mere subterfuge for illegal gaming. *See American Treasures, Inc. v. State*, 173 N.C. App. 170, 177, 617 S.E.2d 346, 350 (2005).

Here, Crazie Overstock has forecast evidence that a customer purchasing gift certificates receives the same face value of certificates as the amount the customer paid (i.e., a $20 payment results in a $20 gift card that may be used to purchase $20 of merchandise, as priced by Crazie Overstock). On the other hand, the State has forecast substantial evidence calling into question the actual value received from the gift card, including, *inter alia*, as to Crazie Overstock's practices in the operation of the retail merchandise component of its business and in the redemption rates of the certificates themselves.

In particular then, at least in part, the question *sub judice* is whether "the price paid for and the value received" from the gift certificates "is sufficiently

commensurate to support the determination that the sale of [gift certificates] is not a mere subterfuge to engage in [illegal gaming], whereby consideration is paid merely to engage in a game of chance." *Id.* at 178-79, 617 S.E.2d at 351 (concluding sale of prepaid long-distance phone cards with an attached game piece did not constitute a lottery scheme where the long-distance rate purchased was among the best in the industry).