IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-57

No. 345PA19

Filed 11 June 2021

CRAZIE OVERSTOCK PROMOTIONS, LLC

v.

STATE OF NORTH CAROLINA; and MARK J. SENTER, in his official capacity as Branch Head of the Alcohol Law Enforcement Division

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 266 N.C. App. 1 (2019), affirming, in part, and reversing and remanding, in part, an order entered on 7 August 2018 by Judge Vince M. Rozier, Jr., in the Superior Court, Alamance County. Heard in the Supreme Court on 23 March 2021.

*Morningstar Law Group, by Keith P. Anthony and William J. Brian, Jr., for plaintiff-appellant.*

*Joshua H. Stein, Attorney General, by Olga E. Vysotskaya de Brito, Special Deputy Attorney General; Ryan Y. Park, Solicitor General; and James W. Doggett, Deputy Solicitor General, for the State-appellees.*

*Edmond W. Caldwell, Jr., and Matthew L. Boyatt for North Carolina Sheriffs' Association; Fred P. Baggett for North Carolina Association of Chiefs of Police; and Jim O'Neill for North Carolina Conference of District Attorneys, amici curiae.*

ERVIN, Justice.

This case arises from an enterprise developed and operated by plaintiff Crazie Overstock, LLC, which has sought in this litigation to enjoin enforcement measures

taken by the State and certain members of the State's Alcohol and Law Enforcement Division[1] stemming from the belief that a Rewards Program encompassed within the operation of Crazie Overstock's enterprise violates various provisions contained in Article 37 of Chapter 14 of the North Carolina General Statutes. For the reasons set forth in more detail below, we modify and affirm the decision of the Court of Appeals.

¶ 2    Crazie Overstock sells discount goods, such as furniture, jewelry, kitchen goods, movies, music, and electronics on its website and through licensed retail establishments which are operated by independent owners. Although Crazie Overstock's customers have the ability to view the goods that are offered for sale, both in these retail establishments and on Crazie Overstock's website, the goods in question may only be purchased through its website.

¶ 3    The retail establishments through which Crazie Overstock operates feature a "showroom" in which samples of the goods that are available through Crazie Overstock's website are displayed. In addition, these retail establishments contain computers, which Crazie Overstock refers to as "order stations," that are connected to the internet and through which customers have the ability to order products from Crazie Overstock's website. In addition, customers are also entitled to place orders

---

[1] More specifically, Crazie Overstock has sought relief in this case against Mark J., Senter, individually and in his official capacity as Director of the Alcohol Law Enforcement Division, and Iris L. Redd, Kelly J. McMurray, Chris Poole, and Brian Doward, each of whom are agents of the Alcohol Law Enforcement Division; in their official and individual capacities.

through Crazie Overstock's website from any location at which an internet connection is available. Crazie Overstock's customers have the ability to either order goods through the website using a credit card or to purchase electronic gift certificates at retail establishments which the customer can use to purchase goods through Crazie Overstock's website.

¶ 4 The customers who purchase gift certificates at the retail establishments through which Crazie Overstock operates pay $1.00 for each $1.00 of credit that is available in connection with a particular gift certificate. Each customer who purchases a gift certificate receives a receipt bearing a number which can be registered with and credited to the customer's account, which, in turn, can be accessed using an individual username and password at an order station or on any device that is connected to the Crazie Overstock website through the internet. In view of the fact that the value of any gift certificate that a customer may purchase is not automatically loaded into the customer's account, gift certificates may be freely transferred from the customer to other persons. Although customers may utilize gift certificates to purchase goods through the Crazie Overstock website, any such purchases involve separately stated shipping and handling charges that the customer must cover using a credit card.

¶ 5 The portion of Crazie Overstock's enterprise that underlies this case is known as the Rewards Program and revolves around the use of gift certificates to play two

electronic games. In order to play these games, a customer is required to obtain Game Points by either (1) purchasing a gift certificate, with 100 Games Points being provided to the customer for every $1.00 that the customer pays in order to purchase that gift certificate; (2) "mailing a handwritten post card . . . contain[ing] the [customer's] name; address; city; state; zip code; age; date of the request for Game Points; and the name and store address" at which the points are to be used; (3) making an "in-store request from the cashier at a Retail Establishment's point-of-sale terminal"; or (4) "through the award of bonus Game Points by Retail Establishments to customers who purchase certain amounts of gift certificates." After obtaining the required Game Points, the customer may use them to play the two electronic games.

¶ 6 In the first of the two electronic games, which consists of a game of chance called the Reward Game, the customer is entitled to utilize Game Points for the purpose of attempting to win Reward Points. The Reward Game features eighteen reel-spinning games which are played on an electronic machine during which various icons appear when the reel is spun. The results derived from playing the Reward Game are "drawn randomly for each of the [eighteen] different Reward Games . . . from a finite pool of possible results," with "some results [being] associated with Reward Points while others are not." A customer who is successful in playing the Reward Game receives a number of Reward Points equal to a multiple of the number of Game Points which the customer utilized in order to play the Reward Game. In

the event that the customer is unsuccessful during his or her attempts to play the Reward Game, he or she is still awarded 100 Reward Points.

¶ 7 After playing the Reward Game, the customer is entitled to take the Reward Points that he or she earned playing the Reward Game and utilize them to participate in a game of skill called the Dexterity Test. The Dexterity Test involves the use of a simulated stopwatch that counts from 0 to 1,000 and back at a rapid rate. During the course of the Dexterity Test, the customer is allowed three attempts to stop the stopwatch on a number as close to 1,000 as possible, with the customer being awarded Dexterity Points based upon his or her best result. In the event that the customer stops the simulated stopwatch at a point between 951 and 1,000, one-hundred percent of the Reward Points that the customer used to play the Dexterity Test are converted to Dexterity Points, which can be redeemed for a cash payment calculated at the rate of $1.00 for every 100 Dexterity Points. In the event that the customer stops the simulated stopwatch at a point between 901 and 950, ninety percent of the Reward Points that the customer used to play the Dexterity Test are converted to Dexterity Points. In the event that a customer stops the simulated stopwatch at a point between 801 and 900, fifty percent of the Reward Points that the customer used to play the Dexterity Test are converted to Dexterity Points. In the event that the customer stops the simulated stopwatch at a point between 0 and 800, he or she does not win any Dexterity Points. On the other hand, the Reward Points that any such

unsuccessful customer utilized to play the Dexterity Test are converted into Game Points so as to allow the customer to play the Reward Game in the hope of winning additional Reward Points.

¶ 8        The record reflects that ninety-five percent of the customers who play the Dexterity Test successfully stop the simulated stopwatch at a point above 800 on at least one of their three attempts so as to win some amount of money.  As a result, a customer who successfully plays the Reward Game and proceeds to play the Dexterity Test will likely recoup some portion of the money that he or she utilized in purchasing the gift certificate that allowed him or her to play the games.  However, in the event that the customer does not successfully play the Reward Game, the cash price that he or she is able to win is limited to a maximum of $1.00.  In addition, the customer retains the full value of the gift certificate that he or she purchased and is entitled to use it to purchase merchandise from Crazie Overstock's website.

¶ 9        On 24 May 2016, Crazie Overstock filed a complaint against defendants in which it sought (1) a declaratory judgment that the Rewards Program is lawful and did not violate N.C.G.S. §§ 14-289 (prohibiting the advertisement of lotteries), 14-290 (prohibiting "[d]ealing in lotteries"), 14-292 (prohibiting gambling, defined as "any game of chance or any person who plays at or bets on any game of chance at which any money, property or other thing of value is bet, whether the same be in stake or not"), 14-306 (defining slot machines), 14-306.1A (prohibiting the use of video gaming

machines, including a "video game not dependent on skill or dexterity that is played while revealing a prize as the result of an entry into a sweepstakes"), 14-306.3 (prohibiting certain game promotions), 14-306.4 (prohibiting the operation of "an electronic machine or device" to play a "video game not dependent on skill or dexterity that is played while revealing a prize as the result of an entry into a sweepstakes," with a "prize" being "any gift, award, gratuity, good, service, credit, or anything else of value"), or "any other applicable law of this State"; (2) permanent injunctive relief; (3) a request for a declaratory judgment that Director Senter and Agents McMurray, Poole, Doward, and Redd had deprived Crazie Overstock of its constitutional right to procedural due process; (4) prospective injunctive relief against Director Senter and Agents McMurray, Poole, Doward, and Redd based upon alleged violations of 42 U.S.C. § 1983; and (5) damages against Agents McMurray, Poole, Doward, and Redd, in their individual capacities, jointly and severally, for violations of 42 U.S.C. § 1983. The injunctive relief that Crazie Overstock sought in its complaint included enjoining defendants from (1) warning or threatening any current or potential North Carolina retail establishment that it might be subject to criminal or administrative sanctions if it continued to display or sell Crazie Overstock gift certificates or operate equipment associated with the Rewards Program; (2) citing any North Carolina retail establishment for criminal or administrative offenses or violations based upon the display or sale of Crazie Overstock gift certificates or products, or the operation of

any equipment associated with the Rewards Program; (3) compelling or attempting to compel, coerce, or persuade any North Carolina retail establishment to remove products and equipment associated with the Rewards Program or to refrain from selling or operating any such items; (4) making or issuing any statement outside of the proceedings in this case alleging or contending that any gift certificates, products, or equipment associated with the Rewards Program constituted an illegal gambling arrangement, lottery, game of chance, slot machine, or unlawful device; and (5) filing any false or misleading affidavits or otherwise engaging in any similar deceptive or unlawful conduct in connection with any investigation into the activities in which Crazie Overstock or any retail establishment offering the Rewards Program has engaged.

¶ 10 On 1 July 2016, defendants filed a motion to dismiss Crazie Overstock's complaint pursuant to N.C.G.S. §§ 1A-1, Rules 12(b)(1), (2), and (6), in which they contended that Crazie Overstock's claims were barred by the doctrines of sovereign immunity, public official immunity, and qualified immunity and asserting that Crazie Overstock's request for a declaratory judgment that its Rewards Program did not violate N.C.G.S. § 14-306.4 failed to state a claim upon which relief might be granted. On 13 April 2017, the trial court entered an order denying defendants' dismissal motion.

¶ 11 On 17 March 2017, Crazie Overstock filed a motion seeking the issuance of a preliminary injunction that provided the same relief that it sought in that portion of its complaint seeking the issuance of a permanent injunction. On 16 May 2017, the trial court entered a temporary restraining order precluding defendants from taking certain actions against Crazie Overstock and any retail establishments participating in the Rewards Program pending a decision concerning Crazie Overstock's request for the issuance of a preliminary injunction. On 12 July 2017, defendants filed an answer in which they denied the material allegations set out in Crazie Overstock's complaint and asserted a number of affirmative defenses, including public official immunity, sovereign immunity, qualified immunity, and estoppel.

¶ 12 A hearing concerning the merits of Crazie Overstock's motion for the issuance of a preliminary injunction was held before the trial court on 29 September 2017, 5 and 6 October 2017, and 2 and 3 November 2017. On 13 December 2017, the trial court entered an order denying Crazie Overstock's motion for preliminary injunctive relief. In making this determination, the trial court concluded that Crazie Overstock had failed to demonstrate that it was likely to succeed on the merits given (1) that "[t]he fact that Crazie Overstock's games involve some level of skill and dexterity in and of itself is not enough to show a likelihood of prevailing on the merits"; (2) that "[t]he test for determining whether a game is prohibited under North Carolina law is not whether the game contains an element of skill," but is, "[i]nstead, . . . whether

chance is the dominating element that determines the result of the game," citing *Sandhill Amusements, Inc. v. Miller*, 236 N.C. App. 340, 368 (2014), *rev'd per curiam on the basis of the dissenting opinion*, 368 N.C. 91 (2015); and (3) that "[t]he element of chance predominates any amount of skill or dexterity that may be present in Crazie Overstock's games, and therefore the Crazie Overstock Rewards Program may violate N.C.G.S. § 14-306.4 and other North Carolina gambling provisions." In addition, the trial court concluded that Crazie Overstock had failed to show that it was likely to sustain an irreparable injury in the absence of the issuance of the requested preliminary injunction given that (1) "Crazie Overstock's ability to sell goods over the internet will in no way be affected by law enforcement officials being allowed to enforce what they believe to be violations of the gambling laws of North Carolina as performed by retail establishments that are operating the Crazie Overstock Rewards Program"; (2) "[Crazie Overstock] will still be able to use its website to sell goods over the internet and may continue to license retail establishments to promote the sale of their goods by displaying goods for sale and selling gift certificates"; and (3) "[t]he only impact not entering an injunction will have is that the retail establishments, that are not a party to this action, will not be able to continue to use the Crazie Overstock Rewards Program until such time as a trial/hearing on the merits is conducted and this Court rules on the pending declaratory judgment action."

¶ 13     On 11 July 2018, defendants filed a motion seeking the entry of summary judgment in their favor on the grounds that the record did not reveal the existence of any genuine issues of material fact and that defendants were entitled to judgment as a matter of law with respect to Crazie Overstock's claims pursuant to N.C.G.S. §§ 14-306.1A and 14-306.4. On 20 July 2018, Crazie Overstock voluntarily dismissed its claims against Agents McMurray, Poole, Doward, and Redd, in both their individual and official capacities, without prejudice and the claims that it had asserted against Director Senter in his individual capacity. In addition, Crazie Overstock voluntarily dismissed the claims that it had asserted pursuant to 42 U.S.C. § 1983 relating to alleged violations of its procedural due process rights and its request for prospective relief against Director Senter without prejudice, leaving the State and Director Senter, acting in his official capacity, as the only remaining defendants.

¶ 14     On 25 July 2018, defendants' summary judgment came on for a hearing before the trial court.[2] On 7 August 2018, the trial court entered an order determining that there were no genuine issues of material fact with respect to the claims that Crazie

---

[2] At the hearing, Crazie Overstock objected to consideration of the expert reports submitted by defendants on behalf of Andrew Baran and Katrijn Gielens on the grounds that those reports had not been properly authenticated, that the reports had not been submitted in a timely manner, that the report prepared by Ms. Gielens contained new opinions that had not been previously disclosed in discovery, and that Mr. Baran's report invaded the province of the trial court by offering opinions concerning the ultimate issue of whether Crazie Overstock's Reward Program violated N.C.G.S. §§ 14-306.1A and 14-306.4. As a result, the trial court "excluded this information from consideration in its evaluation of the motion for summary judgment."

Overstock had advanced pursuant to N.C.G.S. §§ 14-306.1A and 14-306.4 and that defendants were entitled to judgment with respect to those claims as a matter of law.[3] As a result, the trial court allowed defendants' motion for summary judgment, resulting in the dismissal of each of Crazie Overstock's remaining claims and the entry of final judgment in favor of defendants. Crazie Overstock noted an appeal to the Court of Appeals from the trial court's order.

¶ 15 In seeking relief from the trial court's order before the Court of Appeals, Crazie Overstock argued that the trial court had erred by concluding that the Rewards Program violated N.C.G.S. §§ 14-306.1A and 14-306.4. As an initial matter, the Court of Appeals noted that N.C.G.S. § 14-306.1A "prohibits one from placing into operation a video gaming machine which allows a patron to make a wager for the opportunity to win money or another thing of value through a game of chance" and that N.C.G.S. § 14-306.4 "prohibits one from placing into operation an electronic machine which allows a patron, with or without the payment of consideration, the opportunity to win a prize in a game or promotion, the determination of which is based on chance." *Crazie Overstock Promotions, LLC v. State*, 266 N.C. App. 1, 5 (2019). According to the Court of Appeals, "[o]ne difference between [N.C.G.S. § 14-306.4] and [N.C.G.S. §]

---

[3] In light of this determination, the trial court declined to rule upon the claims that Crazie Overstock had advanced pursuant to N.C.G.S. §§ 14-289, 14-290, 14-292, 14-306, and 14-306.3.

14-306.1A is that a violation of [N.C.G.S. § 14-306.4] can occur even if the patron is not required to wager anything for the opportunity to win a prize." *Id.*

¶ 16 After noting that N.C.G.S. §§ 14-306.1A and 14-306.4 "only proscribe machines where prizes can be won through a game of chance" rather than by winning a "game of skill," the Court of Appeals distinguished these two types of games on the basis that:

> The phrase, "game of chance," is not one long known in the law and having therein a settled signification, but was introduced into our statute book by the act of 1835. . . . [This term] must be understood [ ] as descriptive of a certain kind of games of chance in contra-distinction to a certain other kind, commonly known as games of skill. [We hold that] "a game of chance" is such a game, as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill, or adroitness have honestly no office at all, or are thwarted by chance.

*Id.* at 5–6 (alterations in original) (quoting *State v. Gupton*, 30 N.C. 271, 273–74 (1848)). In addition, the Court of Appeals noted that, more recently, this Court has adopted a dissenting opinion reasoning that "the essential difference between a game of skill and a game of chance for purposes of our gambling statutes . . . is whether skill or chance determines the final outcome and whether chance can override or thwart the exercise of skill." *Id.* at 6 (quoting *Sandhill Amusements*, 236 N.C. App. at 369). As a result, the Court of Appeals determined that, even though "there are elements of 'chance' in many 'games of skill'" and that "there are sometimes elements of skill present in games of chance," *id.* (first citing *Gupton*, 30 N.C. at 274, then

*Collins Coin Music Co. of N.C., Inc., v. N.C. Alcoholic Beverage Control Comm'n*, 117 N.C. App. 405, 409 (1994)), "[u]ltimately, whether a game is one of chance or one of skill is dependent on which element 'is the dominating element that determines the result of the game,'" *id.* (quoting *State v. Eisen*, 16 N.C. App. 532, 535 (1972) (recognizing that blackjack contains elements of both skill and chance)).

¶ 17    Although the Court of Appeals determined that the Dexterity Test, considered in isolation, is a game of skill given that "the outcome of the game is dependent primarily on the patrons' ability to react in a timely fashion," it went on to conclude that the Reward Game "is a separate game in which patrons have the opportunity to win something of value," consisting of "*the opportunity* to play an easy game of skill for money," and that "this opportunity to win money, itself," constitutes "a thing of value" and, therefore, a prize pursuant to the definition set forth in the statute. *Id.* at 6–7. As a result, the Court of Appeals held that, even though the Dexterity Test did not, standing alone, violate either N.C.G.S. §§ 14-306.1A or 14-306.4, the Reward Game violated N.C.G.S. § 14-306.4 as a matter of law. *Id.* at 8–9. On the other hand, given that "there [was] at least an issue of fact as to whether the Reward Game violates [N.C.G.S. §] 14-306.1A" arising from the fact that "[o]ne does not violate this Section unless the game of chance requires the patron to wager something of value" and the Court of Appeals' determination that it is "unclear whether, here, patrons are required to wager anything of value," the Court of Appeals affirmed the trial

court's decision to grant summary judgment in defendants' favor with respect to the issue of whether the Rewards Program violated N.C.G.S. § 14-306.4 while reversing the trial court's decision to grant summary judgment in defendants' favor with respect to the issue of whether the Rewards Program violated N.C.G.S. § 14-306.1A and remanding this case to the Superior Court, Alamance County, for any necessary proceedings. *Id.* at 9

In a separate concurring opinion, Judge Hampson stated that, "at least in [his] view, [the Court of Appeals'] reversal of summary judgment on the question of whether Crazie Overstock's business model violates [N.C.G.S.] § 14-306.1A should not be construed as an indication that Crazie Overstock's business model does not violate [N.C.G.S.] § 14-306.1A" and should, instead, be understood as a recognition that "Crazie Overstock has generated a triable issue of fact as to whether the sale of gift certificates, in fact, constitutes the sale of a legitimate product offered in the free marketplace by a business regularly engaged in the sale of such goods or services or whether the sales of these gift certificates constitutes a mere subterfuge for illegal gaming." *Id* (citing *American Treasures, Inc. v. State*, 173 N.C. App. 170, 177 (2005)). In light of the conflicting evidence concerning "the actual value received from [Crazie Overstock's] gift [certificates]," Judge Hampson wrote that "the question *sub judice* is," at least in part, "whether 'the price paid for and the value received' from the gift certificates 'is sufficiently commensurate to support the determination that the sale

of [gift certificates] is not a mere subterfuge to engage in [illegal gaming], whereby consideration is paid merely to engage in a game of chance.'" *Id.* at 10 (quoting *American Treasures*, 173 N.C. at 178–79). This Court granted requests for further review of the Court of Appeals' decision filed by both Crazie Overstock and defendants.

In seeking to persuade us to overturn the Court of Appeals' decision with respect to the issue of whether the Rewards Program violates N.C.G.S. § 14-306.4, Crazie Overstock begins by arguing that the Court of Appeals "fail[ed] to apply the correct legal standard" in evaluating the lawfulness of the Rewards Program pursuant to N.C.G.S. § 14-306.4 and, instead, utilized a broader legal standard applicable under other gambling-related statutory provisions, thereby "ignor[ing]" the relevant statutory language, which provides that prohibited games are those which are "not dependent on skill or dexterity," *see* N.C.G.S. § 14-306.4(a)(3), so as to "render [the relevant statutory] language meaningless." Secondly, Crazie Overstock argues that the Rewards Program does not violate N.C.G.S. § 14-306.4 given that "[w]hether a participant obtains a prize is determined solely by the participant's performance on the Dexterity Test," making the "final outcome [ ] dependent on skill and dexterity." According to Crazie Overstock, "the fact that chance determines the value of the potential prize that can be realized through the Dexterity Test (by determining the amount of Reward Points awarded in the Reward Game) is not

relevant to the analysis of the final outcome of the [ ] Rewards Program" given that "the test under [N.C.G.S. § 14-306.4] is limited to the analysis of the role of skill and chance in the final outcome only." Thirdly, Crazie Overstock asserts that, "even if the standard under the gambling statutes is applied, genuine issues of material fact preclude[ ] the entry of summary judgment for [defendants]" given the existence of "substantial evidence from which a reasonable trier of fact can conclude that skill and dexterity predominate over chance." Finally, Crazie Overstock argues that the Court of Appeals erred by holding that the Reward Game, "viewed in isolation," violates N.C.G.S. § 14-306.4 on the theory that Reward Points constitute a "prize" for purposes of the relevant statutory provision. In Crazie Overstock's view, the Court of Appeals' determination that Reward Points constitute a prize amounts to a "suggest[ion] that the unrealized *opportunity* to play the Dexterity Test has value independent of the value of *playing* the game" even though "[t]he two are inextricably linked" and the "Reward Points have no inherent value."

¶ 20     In response, defendants argue, based upon this Court's decision to adopt the dissenting opinion in *Sandhill Amusements*, that the reference to skill and dexterity contained in N.C.G.S. § 14-306.4 incorporates "the traditional distinction between a game of skill and a game of chance pursuant to state law" so as to "prohibit[ ] sweepstakes that are conducted through video games" in which "chance predominates over skill." In view of the fact that "luck controls the symbols that appear in the reel-

spinning Reward Games, which in turn control whether a customer can win anything more than $1 in cash by playing the Dexterity Test," defendants argue that "pure chance is responsible for whether players ever receive anything more than $1 by playing its games," causing considerations of "chance [to] predominate[ ] in Crazie Overstock's games." In addition, defendants contend that the Court's decision to adopt the dissenting opinion in *Sandhill Amusements* establishes that the Court of Appeals correctly applied the "traditional" predominant factor test rather than the "new test" suggested by Crazie Overstock. In defendants' view, *Sandhill Amusements* makes clear "that chance is the predominate factor when it controls the maximum prizes that players receive" and "can thwart skill by preventing players from winning the best prizes." Finally, defendants claim that predominance is "a mixed question of law and fact that may be resolved on summary judgment where, as here, there is no dispute about how a game is played," citing *Best v. Duke Univ.*, 337 N.C. 742, 750 (1994), on the theory that "mixed questions like [the issues presented in this case] do not turn on assessments of credibility, but instead require 'the application of legal principles' to settled facts," quoting *State v. Sparks*, 362 N.C. 181, 185 (2008), and citing *Sandhill Amusements*, 236 N.C. App. at 370.

¶ 21    According to well-established North Carolina law, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). An appellate court reviews a trial court's decision to grant or deny a motion for summary judgment de novo. *See Meinck v. City of Gastonia*, 371 N.C. 497, 502 (2018).

N.C.G.S. § 14-306.4 prohibits the operation of an electronic machine which allows a user, with or without the payment of consideration, an opportunity to win a prize in a game or promotion in the event that the patron's ability to succeed "[i]s not dependent on the skill or dexterity [of the patron]. N.C.G.S. § 14-306.4(a)(3)(i). In *Sandhill Amusements*, we adopted the dissenting opinion at the Court of Appeals, which evaluated, in pertinent part, whether an enterprise involved an illegal video sweepstakes machines in violation of N.C.G.S. § 14-306.4, *Sandhill Amusements*, 236 N.C. App. at 343, before noting that the critical analytical issue revolves around whether the relevant game was "dependent on skill or dexterity." *Id*. at 365. In spite of the fact that "the term 'skill or dexterity' as used in [N.C.G.S.] § 14-306.4 ha[d] not been statutorily defined," the dissent in *Sandhill Amusements* opined that a reviewing court should look for guidance from the Court of Appeals' prior decision in *Collins Coin*, in which the Court of Appeals held that "[a] game of chance is such a game as is determined entirely or in part by lot or mere luck, and in which judgment, practice, skill or adroitness have honestly no office at all, or are thwarted by chance"; that "[a] game of skill, on the other hand, is one in which nothing is left to chance,

but superior knowledge and attention, or superior strength, agility and practice gain the victory"; and that "[i]t would seem that the test of the character of any kind of a game . . . as to whether it is a game of chance or a game of skill is not whether it contains an element of chance or an element of skill, but which of these is the dominating element that determines the result of the game, to be found from the facts of each particular kind of game" or, "to speak alternatively, whether or not the element of chance is present in such a manner as to thwart the exercise of skill or judgment." *Sandhill Amusements*, 236 N.C. App. at 368 (quoting *Collins Coin*, 117 N.C. App. at 408) (citations and quotations omitted)). In light of the numerous "inherent limitations on a player's ability to win [the game at issue in that case] based upon a display of skill and dexterity," including the fact that the machines and equipment at issue "only permitted a predetermined number of winners," would necessarily "result in the playing of certain games in which the player [would] be unable to win anything of value regardless of the skill or dexterity that he or she displays" and the fact that the opportunity to employ skill or dexterity was "purely chance-based," the dissent in *Sandhill Amusements* noted that it was "unable to see how [an] isolated opportunity [to employ skill or dexterity] to affect the outcome overrides the impact of the other features which, according to the undisputed evidence, affect and significantly limit the impact of the player's skill and dexterity on the outcome." *Id*. at 369. As a result, given these "inherent limitations on a

player's ability to win based upon a display of skill and dexterity," the dissent in *Sandhill Amusements* stated that "an individual playing the machines and utilizing the equipment at issue simply does not appear to be able to 'determine or influence the result over the long haul'" and concluded that "'the element of chance dominate[d] the element of skill in the operation'" of the machines at issue in that case. *Id*. at 369–70 (quoting *Collins Coin*, 117 N.C. at 409).

¶ 23    The dissenting opinion in *Sandhill Amusements* that we later adopted suggests that N.C.G.S. § 14-306.4 should be interpreted to prohibit the operation of electronic gaming equipment in which skill or chance "dominat[e]" over a player's exercise of skill and dexterity or "thwart the exercise of skill or judgment," *id*. at 368 (quoting *Collins Coin*, 117 N.C. at 408).  This construction of the relevant statutory language does not, contrary to Crazie Overstock's contentions, render the words "dependent on skill or dexterity" as found in N.C.G.S. § 14-306.4(a)(3) superfluous.  Instead, the approach that we believe to be appropriate simply focuses upon whether skill or dexterity *actually* give the player the ability to control the extent to which he or she receives a prize and the value of the prize that he or she wins rather than merely reflecting whether the player bests the odds of winning in a game of chance.[4]  Thus,

---

[4] Assuming that all of the other requirements set forth in the statute are met, nothing in this opinion or the dissenting opinion which we adopted in *Sandhill Amusements* should be interpreted as an indication that a gaming enterprise in which skill or dexterity actually predominate in resolving the issue of whether the player receives a prize and the value of

the relevant test for use in determining whether the operation of an electronic gaming device does or does not violate N.C.G.S. § 14-306.4(a) is whether, viewed in its entirety, the results produced by that equipment in terms of whether the player wins or loses and the relative amount of the player's winnings or losses varies primarily with the vagaries of chance or the extent of the player's skill and dexterity.

¶ 24    After applying the appropriate legal standard to the facts presented to us in this case, we are satisfied that the Court of Appeals correctly concluded that the Crazie Overstock's gaming enterprise violated N.C.G.S. § 14-306.4. As an initial matter, given that the number of Reward Points increases the dollar value of the prizes that a player is entitled to win in the course of the Dexterity Test, the increased potential return available to such players during the Dexterity Test compels the conclusion that Reward Points constitute a "[ ]thing . . . of value" pursuant to N.C.G.S. § 14-306.4(a)(4). For that reason, the Reward Game, even when considered in isolation, violates N.C.G.S. § 14-306.4.

¶ 25    Any decision to consider the Reward Game and the Dexterity Test in conjunction with each other produces the same result, Crazie Overstock's argument to the contrary notwithstanding. In spite of the fact that the Dexterity Test, viewed in isolation, involves skill or dexterity, the extent to which a customer is able to win

that prize would violate N.C.G.S. § 14-306.4, ensuring that the relevant language does not constitute mere surplusage.

more than a minimal amount of money is controlled by the outcome of the Reward Game regardless of the level of skill and dexterity that the player displays while participating in the Dexterity Test. For instance, a person who is wholly unsuccessful in playing the Reward Game cannot win more than $1.00 in the event of success in the Dexterity Test regardless of how well he or she performs while playing that game, a fact that establishes that the amount of a player's winnings is primarily dependent upon chance rather than skill or dexterity as required by N.C.G.S. § 14-306.4. *Cf. Joker Club, LLC v. Hardin*, 183 N.C. App. 92, 98 (2007) (stating that "the only factor separating the players" in a game of poker is the "relative skill levels" of the players). In other words, a customer cannot win more cash playing the Dexterity Test than the amount established by the chance-driven Reward Game, although a customer may be able to reduce the amount of cash that he or she eventually obtains by poor performance during that phase of the process, a fact that compels the conclusion that "the instrumentality for victory [is not] entirely in the player's hand." *Joker Club*, 183 N.C. App. at 99. As a result, we hold that luck is so "inherent in the nature of [Crazie Overstock's] games" that chance necessarily predominates over the exercise of skill or dexterity, *Gupton*, 30 N.C. at 274, so that Crazie Overstock's Rewards Program should be classified as a game of chance rather than a game of dexterity or skill. *See Sandhill Amusements*, 236 N.C. App. at 368.

The result that we reach in this case is completely consistent with the General Assembly's intent in enacting N.C.G.S. § 14-306.4. As we recognized in *Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289 (2012), the General Assembly "noted that 'companies have developed electronic machines and devices to gamble through pretextual sweepstakes relationships with Internet service, telephone cards, and office supplies, among other products,' and that 'such electronic sweepstakes systems utilizing video poker machines and other similar simulated game play create the same encouragement of vice and dissipation as other forms of gambling . . . by encouraging repeated play, even when allegedly used as a marketing technique." *Id.* at 294 (quoting An Act to Ban the Use of Electronic Machines and Devices for Sweepstakes Purposes, S.L. 2010-103, 2010 NC. Sess. Laws 408, 408). As we understand the record, this statement of intent clearly describes the manner in which Crazie Overstock's Rewards Program operates. Thus, we have no hesitation in holding that Crazie Overstock's Rewards Program represents the type of gaming enterprise that the General Assembly intended to prohibit by enacting N.C.G.S. § 14-306.4.[5] In light of our determination that Crazie Overstock's Rewards Program

---

[5] In addition to responding to Crazie Overstock's challenge to the Court of Appeals' decision, the State argued that Crazie Overstock's enterprise (1) violated the State's ban on video gaming machines as set forth in N.C.G.S. § 14-306.1A, which defines a prohibited "video gaming machine" to include any "video game not dependent on skill or dexterity that is played while revealing a prize as the result of an entry into a sweepstakes," *see* N.C.G.S. § 14-306.1A(b)(9); and (2) constituted an illegal gambling enterprise pursuant to N.C.G.S. §§ 14-292 and 14-301 on the grounds that "participants [in the Rewards Program] are not really

constitutes an unlawful sweepstakes in violation of N.C.G.S. § 14-306.4 and the fact that this determination appears to us to preclude the award of any relief in Crazie Overstock's favor, we conclude that there is no need for the Court to decide either of the other issues addressed in the parties' briefs and modify the Court of Appeals' decision by obviating any necessity for a remand to the Superior Court, Alamance County, for further proceedings in this case. As a result, since the Court of Appeals correctly determined that the trial court did not err by determining that Crazie Overstock's gaming enterprise constitutes an unlawful sweepstakes in violation of N.C.G.S. § 14-306.4, we modify and affirm the Court of Appeals' decision.

MODIFIED AND AFFIRMED.

Justice BERGER did not participate in the consideration of or decision in this case.

---

buying the promoted products," with "the purchase of the products" being, instead, nothing more than "a pretext to place bets," citing *Hest*, 366 N.C. at 294.